## OLES ENVELOPE CORPORATION ET AL. *v.* OLES
[No. 145, October Term, 1948.]

80

*Decided April 29, 1949.*

The cause was argued before MARBURY, C. J., and DELA-PLAINE, COLLINS, GRASON, and HENDERSON, JJ.

*William D. Macmillan,* with whom were *Maurice Flynn, Jr.* and *Semmes, Bowen & Semmes* on the brief, for appellant, W. W. Oles.

*J. Royall Tippett, Jr.,* with whom were *Hinkley & Singley* on the brief, for appellant, Oles Envelope Corporation.

*George Ross Veazey* and *Wendell D. Allen,* with whom was *Francis B. Burch* on the brief, for appellee.

DELAPLAINE, J., delivered the opinion of the Court.

These two appeals are from a decree granting Charlotte Lehman Oles, of Baltimore, a divorce *a mensa et thoro* from her husband, Wallace William Oles, now engaged in business in Texas, ordering her husband to pay her permanent alimony and to pay for the support of their children, annulling the sale of stock which he owned in Oles Envelope Corporation, and appointing a trustee to hold all of his assets in the State of Maryland.

The parties were married in 1927. They have two daughters, Charlotte, age 19, and Jean, age 15. In 1924 Oles started to work with his father, Burdette S. Oles, who started in the envelope business in Pittsfield, Massachusetts, in 1898, and came to Baltimore in 1912 to embark in business here. His envelope business was successful and was incorporated in 1920. After 25 years of work in Baltimore, the father devoted more of his time to the raising of cattle on his farm in Baltimore County. In 1939 he retired as president of the corporation, and his son took his place. In 1942 the son received a commission in the United States Coast Guard and served in New Guinea. After his discharge in 1945, he returned to his home at 114 Enfield Road and to his work at the envelope plant on Loch Raven Road. His father, who managed the business in his absence, gave back to him the position of president of the corporation, for which he received a salary of $45,000 a year.

In 1946 Oles became increasingly intimate with Mrs. Adaleine Brook, a divorced woman, who owned a ranch near Brady, Texas. On December 25, 1946, he deserted his wife, and on January 2, 1947, bought a house on Erdman Avenue, having the title put in his father's name

without his father's knowledge. In June, after selling that property, and borrowing $37,500 from the First National Bank on his life insurance policies as collateral, he purchased an estate known as "Wilton Woods" in Green Spring Valley, containing about 12 acres, for $52,500, after Mrs. Brook had inspected it and given her approval. When he settled for it on July 8, the title was put in the name of Frederick J. Singley, his attorney. On July 14 his wife instituted suit for divorce *a mensa et thoro*. That afternoon he returned to the home on Enfield Road, and his wife, after she had been deserted for six months, agreed to reconciliation, and that evening she agreed to dismiss her suit and he agreed (1) to deed the home on Enfield Road to his wife through the medium of a "straw party"; (2) to transfer their jointly held stock in the First National Bank to his wife; (3) to pay her attorneys, Wendell D. Allen and George Ross Veazey; and (4) to give her his Buick automobile. Later that night the couple left on a trip to Ocean City, Maryland, and on their return several days later, Oles carried out his agreement. On August 19 they left on a trip to Europe and returned September 21. On November 9 Oles left his wife again, and resumed his trips to Texas. He telegraphed his wife that he was taking a much needed rest. About two weeks later he phoned Charlotte to tell her mother that he was not coming back. On December 4, 1947, Mrs. Oles filed the pending suit.

Ever since the war, Oles seemed "unsettled," and was not sufficiently industrious and economical to please his father. In addition to a Cadillac automobile, which he had at his disposal, he had an airplane, which was bought with the corporation's money for his own use at a cost of $30,000, without his father's consent, but which burned up in South Carolina in March, 1947, and afterwards an "executive bus," for which he paid $22,000, and on which he spent $22,000 more for elaborate improvements. His father was of the opinion that he used the plane and the bus more as a means of visiting his friend, Mrs. Brook, than as a means of increasing the

sales of envelopes. Before the close of 1947 Oles' father warned him that "he had to spend more time in the business and less time in Texas." But he did not heed the warning, and his father, who had the controlling interest in the corporation, determined to drop him from the board of directors and take away his authority to sign checks. Accordingly, at the annual meeting of stockholders on March 1, 1948, the father nominated a new board of directors, omitting his son. At a meeting of the directors immediately afterwards, the father nominated his son as president, but the son was so disgruntled that he resigned his position, although it paid a salary of $45,000. Thereupon the father became president again.

In March, 1948, Oles decided to raise cattle on Mrs. Brooks's ranch in Texas. His father had raised cattle primarily for breeding and exhibition, but he himself had acquired some experience in the cattle business. Accordingly he directed his real estate agent to sell his estate in Green Spring Valley. The agent sold it back to the original owner for $30,000. Oles thus sustained a loss of $22,500, and he also paid the real estate agent a commission of $1,500.

Oles' principal asset, which he now wanted to sell, was his stock in Oles Envelope Corporation. He owned 1,350 shares of 8 per cent preferred stock and 880 shares of common stock. His father explained that he did not desire to buy more stock, as he already held more than two-thirds of the outstanding stock. But a few days later his son offered all of his stock, with a book value of $208,427.20 for $250,000, and threatened to "peddle it all around town" if his father would not buy it, and gave him one day to think it over. His offer and threat led to the contract, executed March 30, 1948, by which Oles Envelope Corporation agreed to buy his 1,350 shares of preferred stock, par value $100, for $135,000, and his 880 shares of common stock for $113,907.12, making a total of $248,907.12. At that time Oles owed the corporation $76,874.77, and he agreed to take the bus, which was

then in Texas, at the price of $44,018.67, and that amount with other items made a total indebtedness of $125,943.74. The corporation agreed to pay $23,907.12 in cash, and the balance of $225,000 in ten annual installments of $22,500 each. However, it was understood that the corporation would pay Oles only $10,000 each year in cash and credit the remaining $12,500 on his indebtedness. Frederick J. Singley and Frederick J. Singley, Jr., were named escrow agents to hold the stock and deliver one-tenth of it each year to the corporation upon payment of the annual instalment.

On April 13, 1948, Mrs. Oles filed a supplemental bill of complaint charging that her husband's sale of stock in Oles Envelope Corporation was in fraud of her right to alimony and her children's right to support. She made Oles Envelope Corporation and the two escrow agents codefendants. On May 21 the chancellor passed an interlocutory order requiring Oles to pay $625 per month as alimony *pendente lite* and as support of the two daughters. It also appointed Francis B. Burch receiver to take charge of the husband's assets in the State of Maryland, including (a) the sum of $5,371.71 in bank; (b) his interest in a lot of ground in Guilford, valued at $3,000; (c) his equity of approximately $15,000 in his life insurance policies; and (d) his stock in Oles Envelope Corporation, which he had agreed to sell to the corporation. The order also enjoined Oles from disposing of any of his assets in Maryland, and the corporation from transferring any of his shares of stock.

Among the assets taken by the receiver were ten Augus cows and two Tennessee Walking horses, but these were recovered by Oles upon payment of the sum of $1,900 to the receiver. On July 27 Oles filed a petition alleging that he needed capital for his new business, and praying for a modification of the order at least to the extent of releasing his bank account and his equity in his insurance policies. On September 16 the chancellor dismissed that petition, and filed an opinion that the consideration for the sale of the stock in Oles Envelope Corporation was

inadequate and the contract was a fraud upon the wife and children.

The decree, which was passed October 25, 1948, and from which Oles and Oles Envelope Corporation appealed, (1) granted complainant a divorce *a mensa et thoro* from her husband; (2) awarded her the custody of the two children; (3) ordered her husband to pay $425 per month as permanent alimony, $100 per month for the support of Charlotte and $100 per month for the support of Jean, subject to the further order of the Court; (4) annulled the contract for the sale of the stock, and ordered the escrow agents to surrender the stock certificates and Oles Envelope Corporation to issue certificates in the name of Fidelity Trust Company, trustee; and also declared that the corporation shall have no claim against the stock for the value of the bus transferred to Oles or the sum of $23,907.12 paid to Oles on account of the contract.

The decree, after stating that Oles had moved to Texas and had taken his removable assets with him, and that, in order that the provisions of the decree may be more effectually performed, it is necessary to impound his assets in this State, further ordered: (5) that Fidelity Trust Company, trustee, take possession of the following assets as well as any other assets of Oles which might come into its possession; (a) the sum of $5,371.71 on deposit in Equitable Trust Company in the name of the receiver; (b) Oles' interest in a lot of ground in Guilford; (c) his equity in his life insurance policies held by First National Bank as collateral; and (d) his stock in Oles Envelope Corporation and dividends thereon; (6) that the receiver distribute the remaining assets to the trustee; (7) that the receiver pay the sum of $2,500 as counsel fee to Wendell D. Allen and George Ross Veazey, solicitors for complainant; (8) that in the event the husband shall fail to make any of the alimony payments, the trustee pay the same; and (9) that the Court retain jurisdiction over the subject matters of the case.

First, we affirm the parts of the decree granting complainant a divorce *a mensa et thoro,* and the custody of the two children, ordering her husband to pay $425 per month as permanent alimony, and $100 per month for the support of Charlotte, and $100 per month for the support of Jean, subject to the further order of the Court, and allowing counsel fee to complainant's solicitors. The application for partial divorce was not contested. Nor did Oles object in this Court to the amounts awarded as alimony and for support of the daughters, provided that some of his assets are released to give him capital to enter business to earn money with which to pay the amounts awarded. There was also no objection to the amount of the counsel fee.

Secondly, we reverse that part of the decree annulling the contract for the sale of the stock of Oles Envelope Corporation. We find no basis for the conclusion that the sale was made by Oles to defraud his wife and children. It is true that a decree awarding a wife alimony is sufficient to establish her as a creditor of her husband, and entitled her rights to be protected by the Statute of 13 Elizabeth, ch. 5, 1 Alexander's British Statutes, Coe's Ed., 499, and the Uniform Fraudulent Conveyance Act, which is declaratory of the British Statute. Code 1939, art. 39B, secs. 6, 7. There is unquestionably a difference between the claim of a wife upon her husband's estate and the claim of a wronged wife, who because of the misconduct of her husband becomes entitled to a divorce and has applied or is about to apply for alimony. *Levin v. Levin,* 166 Md. 451, 453, 171 A. 77. A husband has the right to make a transfer of his property, either with or without consideration, even though he strips himself of all means of supporting his wife, and leaves her without the means of subsistence, provided that he does so in good faith and without intention of defrauding her of her just claims upon him and his estate. *Feigley v. Feigley,* 7 Md. 537, 561, 61 Am. Dec. 375; *Sanborn v. Lang,* 41 Md. 107, 114; *Stewart v. Stewart,* 105 Md. 297, 303, 66 A. 16; *Mushaw v. Mushaw,* 183 Md. 511, 519,

39 A. 2d 465. On the other hand, a conveyance made by a husband before and in anticipation of his wife's suit for alimony, or pending such suit, or after a decree has been entered therein in the wife's favor, to prevent her from obtaining alimony, is fraudulent and may be set aside, unless the grantee took in good faith, without notice and for value. The grantee's knowledge of or participation in the fraud of the grantor must be gathered from the various facts composing the transaction and all the surrounding circumstances. Where a conveyance is valid on its face, the burden of proof is upon the party attacking the conveyance to show either (1) that it was not made upon a good consideration, or (2) that it was made with a fraudulent intent on the part of the grantor to hinder, delay or defraud his creditors, and that this intent was known to or participated in by the grantee. *Fuller v. Brewster,* 53 Md. 358, 359; *McCauley v. Shockey,* 105 Md. 641, 66 A. 625; *Kennard v. Elkton Banking & Trust Co.,* 176 Md. 499, 6 A. 2d 258.

In the case before us the husband sold the stock at more than $42,000 above its book value. It is argued that the stock was worth considerably more than the book value. But it must be appreciated that it might have taken some time to find someone who would invest more than a quarter of a million dollars in an unlisted stock, and that Oles wanted to sell promptly. In *Feigley v. Feigley,* 7 Md. 537, 561, 61 Am. Dec. 375, where the wife instituted suit for divorce and alimony, and pending the suit the husband made a deed conveying certain property to his sister, and the wife thereupon charged in a supplemental bill that her husband had made the conveyance for a trifling consideration in order to defraud her of her alimony, it was shown that the property was worth about $800, and that the consideration for the deed was only $200, but the Court of Appeals found that there was no direct evidence in the record as to any fraudulent participation of the sister in the transaction. As in that case, we likewise hold here that there is not such a glaring inadequacy of consideration as

of itself to stamp the transaction with fraud by shocking the common sense of honesty and thereby to render the transaction void.

There is no evidence in this case to prove that, in executing the contract for the sale of the stock, the husband was attempting to escape his obligations to his wife and daughters. The evidence shows that he has provided abundantly for them. In July, 1947, he conveyed to his wife the Enfield Road home, free of dower, and all of its furniture. He testified that he had been offered $40,000 for the house, and that the furniture was worth approximately $30,000. He also gave her bank stock worth about $6,000 and a new automobile. He sent Charlotte to Goucher College, and Jean to Bryn Mawr. He also paid $2,000 to his wife's attorneys for their services in connection with the first suit for divorce, which was instituted on July 14, 1947, and dismissed a week later. It is obvious that Oles, disgruntled by his father's action, sold his stock to withdraw from the corporation as quickly as possible in order to start anew in another business.

Appellee relied strongly on *Buffum v. Peter Barceloux Co.*, 289 U. S. 227, 53 S. Ct. 539, 541, 77 L. Ed. 1140, a bankruptcy trustee's suit, where the principal assets of Barceloux, the bankrupt, were his certificates of stock in a family corporation, which were delivered as security for an indebtedness much less than the value of the collateral deposited, and the Court held that the bankrupt's pledge of stock was made in fraud of creditors. In that case Justice Cardozo said: "There was to be a sale so secret that none of the creditors would be likely to know anything about it, with the result that other bids would be forestalled, and embarrassing inquiries as to preferences averted. Finally, to make the job a thorough one, the odds and ends of other assets were to be conveyed to friends or relatives. * * * The Barceloux Company set out to do something more than secure the payment of a debt. It became a party to a plan to appropriate a surplus and in combination with its debtor to hold his

creditors at bay." But in the case before us there is no evidence whatever to warrant the inference that Oles' father had any intention to defraud his daughter-in-law and grandchildren, of whom he was very fond. The obvious situation was that his son had caused him worry ever since the Second World War by his lack of interest in the business and his extravagance, and he arranged for the purchase of the stock to keep it from being sold on the market.

Finally we reverse that part of the decree which orders all of the husband's property in this State to be held by a trustee. In England a husband who would not pay alimony was excommunicated by the ecclesiastical court. In 1813 excommunication by the ecclesiastical courts for civil purposes was forbidden, and thereafter a husband in contempt for disobeying a decree for alimony was certified to the Court of Chancery, from which tribunal a writ of contempt was issued for his imprisonment. If imprisonment did not secure obedience, then a writ of sequestration was issued against his property. The writ of *ne exeat* was also used in aid of an alimony decree passed by the ecclesiastical court. If after such a decree, the husband was about to flee from the country to evade payment, the Court of Chancery would restrain him by this writ. The latter Divorce Court was directed by statute to enforce its orders after the practice in chancery. 20 & 21 Vict., ch. 85; *2 Bishop, Marriage, Divorce and Separation,* secs. 1090, 1091, 1112.

The Maryland Legislature has conferred upon the courts of equity the power to enforce their decrees by means of contempt, sequestration, execution and attachment, and injunction. Our Chancery Act provides: "The court may, for the purpose of executing a decree, or to compel the defendant to perform and fulfill the same, issue attachment of contempt, attachment with proclamations and sequestration against the defendant, and may order an immediate sequestration of the real and personal estate and effects of the defendant, or such parts thereof as may be necessary to satisfy the decree

and clear the contempts, or may issue a *fieri facias* against the lands and tenements, goods and chattels of the defendants, to satisfy the said decree, or may issue an attachment by way of execution against the lands, tenements, goods, chattels and credits of the defendant, to satisfy the said decree; or the court may cause, by injunction, the possession of the estate and effects whereof the possession or a sale is decreed to be delivered to the plaintiff, or otherwise, according to the tenor and import of such decree, and as the nature of the case may require * * *." Code 1939, art. 16, sec. 211.

The obligation to pay alimony in a divorce proceeding is regarded not as a debt, but as a duty growing out of the marital relation and resting upon sound public policy. Hence this obligation may be enforced by attachment of the person for contempt, and the defendant may be imprisoned unless he can purge himself of the contempt by paying or by showing that he has neither the estate nor the ability to pay. *Dickey v. Dickey*, 154 Md. 675, 681, 141 A. 387, 58 A. L. R. 634. When a defendant is arrested and brought into court upon any process of contempt issued to compel the performance of any decree for alimony, the court may order such defendant to stand committed, or may order his estate and effects to be sequestered, and payment made as ordered by the decree. The remedy of sequestration may be resorted to in a divorce suit to enforce payments of alimony by a delinquent husband by preventing him from escaping the obligation by leaving the State. *Smith v. Smith*, 255 App. Div. 652, 9 N. Y. S. 2d 188. In the present case the husband was not delinquent in payment of alimony. There is also a specific provision in the Maryland alimony statute that where alimony is prayed in a bill of complaint for divorce against a non-resident, and the bill sets forth that the non-resident defendant is possessed of property in this State, the court shall have authority to award alimony, and any property in this State of any person against whom alimony may be so awarded shall be liable for the same and subject to

such decree as the court may pass in the premises. Code 1939, art. 16, sec. 16. Thus the court may issue an order for sequestration of the husband's property within this State where he is absent from the State and personal service of process cannot be obtained. *Keen v. Keen,* 191 Md. 31, 60 A. 2d 200. In this case, however, complainant alleged in the bill of complaint that defendant is a resident of the State of Maryland, and defendant appeared and answered the bill. At the trial of the case defendant gave the Stafford Hotel in Baltimore as his address, and testified that he still considers himself a resident of Maryland.

In the opinion filed in this case the chancellor stated that the husband is now living in Texas without any intention of returning to Maryland; that he has been moving his assets to Texas as fast as possible; and that, if his stock in Oles Envelope Corporation were not held in trust, he could assign his interest in the contract of sale at any time, and his actions indicated that he would not hesitate to do so. However, under the terms of the contract, the sum of $100,000 is payable in ten annual instalments of $10,000 each. These instalments are more than enough to pay the amounts ordered by the decree. The decree orders Oles to make all payments of alimony to Fidelity Trust Company as trustee, and the trustee is then directed to turn the money over to Mrs. Oles.

It is generally held that in a wife's action for divorce and alimony, the court has the power to appoint a receiver to take possession of the husband's property, where it appears that the husband has absented himself from the State and is endeavoring to sell the property and obtain the entire proceeds for himself. *Nichols v. Superior Court in and for Los Angeles County,* 1 Cal. 2d 589, 36 P. 2d 380, 95 A. L. R. 894. As stated in *Lynde v. Lynde,* 181 U. S. 183, 21 S. Ct. 555, 557, 45 L. Ed. 810, provisions for bond, sequestration, injunction, and receiver in a decree for alimony have no extraterritorial operation, but the action of the court in any State in these respects depends upon the statutes and practice in that

State. The advisability of the appointment of a trustee was recognized in *Ricketts v. Ricketts,* 4 Gill 105, 107, where the wife alleged in her suit for divorce and alimony that her husband owned various pieces of leasehold property, and that her husband could alienate this type of property pending the suit and defeat any alimony decree. The Court of Appeals gave its approval to an injunction which had been issued to enjoin the husband from alienating any of the property until he conveyed to a trustee for the wife's benefit such property as should be deemed sufficient to yield the amount ordered to be paid.

We see no reason to impound indefinitely Oles' money in bank and his interest in his lot in Guilford. His principal asset in Maryland is his interest in the contract for the sale of his stock. We have indicated that the contract should not be annulled, and thus the sum of $10,000 is payable to Oles each year for ten years. The court has statutory authority to protect the rights of the wife by sequestration, by execution and attachment, and by injunction. In view of the finding of the chancellor that Oles is removing his property from the State, we hold that he should be enjoined from assigning his contract, and Oles Envelope Corporation should be required to pay the annual instalments to a trustee to be appointed by the chancellor, the said trustee to pay therefrom any unpaid amounts of alimony due the wife and support due the children, and after paying the necessary costs and commissions to turn over the balance to Oles.

> *Decree affirmed in part and reversed in part, and case remanded for the passage of a decree in accordance with this opinion, the costs to be paid by Wallace William Oles, appellant.*