SCHWARTZMAN *v.* SCHWARTZMAN
(Three Appeals in One Record)
[No. 76, October Term, 1953.]

*Decided February 12, 1954.*

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Herbert Myerberg* and *J. Edgar Harvey*, with whom were *Harvey & Cropper* on the brief, for appellant.

*Hamilton P. Fox, Jr.,* and *Harry C. Dashiell,* with whom were *Hearne, Fox & Bailey* on the brief, for appellee.

DELAPLAINE, J., delivered the opinion of the Court.

Esther F. Schwartzman, a resident of Princess Anne, brought this suit against her husband, Morton I. Schwartzman, a resident of Baltimore, for a divorce *a mensa et thoro,* temporary and permanent alimony, sale and division of jointly owned personal property, and counsel fee for her attorneys.

The parties were married in Baltimore on March 18, 1951. At that time complainant, a daughter of Mr. and Mrs. Herman Fox, of Princess Anne, was 21 years old. In June, 1950, she was graduated from Goucher College, and in the following September she accepted a position as statistician in the State Department of Education. Defendant was 24 years old at the time of marriage. In 1943, while a student at the University of Maryland at College Park, he entered the United States Army. He was sent to Europe where he engaged in combat in the infantry. At the conclusion of the war he was sent

to England to take a three-month course in literature at Oxford University. Upon his discharge in 1946, he resumed his studies at the University of Maryland, and received the degree of Bachelor of Arts in 1948. He also entered the Law School of the University of Maryland in Baltimore in 1947, and in June, 1950, he received the degree of Bachelor of Laws and was admitted to the Maryland bar. He thereupon obtained employment in a law office in Baltimore, for which he received a salary of $50 a week.

The couple lived together only one year, residing in an apartment on Manordene Road in the suburbs of Baltimore. Complainant continued working for the State Board of Education, receiving a salary of over $50 a week. She did not enjoy her work, however, and her husband planned to study accountancy with the hope of augmenting his income. While such additional study would require more time downtown and considerable work at home at night, his wife approved of the plan. Accordingly in September, he entered the course in accountancy given by the Baltimore College of Commerce at the Y.M.C.A. He attended classes three days each week from 8:15 a.m. to 10:30 a.m.

Defendant testified that both before and after marriage, he had poor circulation in his legs, which occasionally produced sudden muscular spasms. However, he applied himself to his work with diligence. While studying accountancy, he had to make up in the law office late in the afternoon the time he lost in the morning. Consequently on three days a week he seldom arrived home much before 8 o'clock in the evening. He then found it necessary to study at home, sometimes until after midnight.

After they had been married about six months, complainant began to complain of fatigue. She consulted two physicians and took vitamin pills. For a while she felt better, but soon she complained again. "Off and on," defendant testified, "she would get the tired fatigue periods and complain about her job and cry, and I would

try to soothe and caress her, and try to see if there was anything I could do to comfort her." Her mother persuaded her to consult Dr. Samuel Whitehouse, a specialist in internal medicine. Dr. Whitehouse examined her on January 21, 1952. Not finding any serious ailment, he suggested that she be examined by a gynecologist. Dr. Ruth Finkelstein, a gynecologist, who had examined her before she was married, examined her again and diagnosed her complaint as tension.

On February 14, 1952, there appeared on the scene a young man whom complainant had met at the University of Wisconsin when she was taking a summer course there. She took him around Baltimore on a sightseeing trip, and invited him to dinner in the apartment that evening. Whether the young man's visit had any bearing on the quick succession of events is not entirely clear. However that may be, defendant testified that on the night of February 17 his wife drew away from him when they were in bed and said: "Morty, it isn't your fault. You haven't done anything wrong to cause this. I have just fallen out of love, and I want to go home to my parents."

In accordance with her resolve, complainant on Wednesday, February 20, abandoned the apartment and took a bus to Princess Anne. Her husband phoned to the home of the Foxes to plead with her to come back, but she refused to talk with him. Her parents, disapproving of her desertion, implored her to go back to her husband. Finally, after several days of consideration, she agreed to return, but she asserted that "there was nothing that could be done to make the marriage agreeable." On Sunday, February 24, her parents brought her back to Baltimore. Her husband was waiting for her at the apartment to give her a cordial welcome, but he found her to be sullen and sarcastic. One of the names she called him was "big gawk."

It is plain that complainant did not want to resume matrimonial relations. Her husband testified that, by her own admission, she came back only as a favor to

her father and mother, who were starting on a vacation trip to Florida, and they were anxious for her to stay with her husband in Baltimore while they were on their trip. During that interim of one month she called her husband conceited, narrow-minded, and "stuffy," and declared that she had no further love for him.

On March 18, 1952, the first anniversary of their wedding, defendant offered his wife some presents, but she spurned them. She called the anniversary a "farce." On the following day her father and mother arrived in Baltimore, and that evening she told her husband that she had decided to leave him and go back to Princess Anne to live with her parents. Defendant testified that he begged her not to leave him, but she said that her decision was final. He further testified that she said she had no grounds for a divorce, but she wanted a divorce, and she hoped he would not give her "a hard time." Thus it is undisputed that complainant deserted her husband on March 20, 1952, and that she has not lived with him since.

On September 22, 1952, complainant instituted this suit against her husband in the Circuit Court for Somerset County alleging (1) that ever since their marriage her conduct toward her husband was kind, affectionate and beyond reproach; and (2) that while they were living together in Baltimore, her husband without just cause or reason constructively deserted her.

It was not until January 22, 1953, four months after the institution of suit, that complainant petitioned the Court to authorize her to take testimony for the purpose of determining the allowance of alimony *pendente lite*.

On February 14 the chancellor, acting upon an agreement of the parties, ordered defendant to pay alimony *pendente lite* at the rate of $20 a week, accounting from that date to February 26, the date set for the trial of the case, provided that if the trial should be postponed upon defendant's request, then the payments should continue until further order of the Court.

On June 2, 1953, the chancellor passed the final decree, which (1) awarded complainant a divorce *a mensa et thoro,* (2) ordered defendant to pay permanent alimony at the rate of $15 a week, (3) ordered him to pay to complainant's attorneys the sum of $300 as counsel fee, and (4) ordered that jointly owned personal property be sold and divided equally between them.

On August 6 the chancellor passed an order adjudging defendant guilty of contempt of Court for failure to pay (1) alimony *pendente lite* in accordance with the order of February 14, and (2) permanent alimony in accordance with the decree of June 2; and directed the sheriff to arrest him and bring him before the Court.

On August 22 the chancellor passed another order which (1) interpreted the order of February 14 to mean that defendant was obligated to pay alimony *pendente lite* at the rate of $20 a week from February 14 to June 2; and (2) revoked that part of the order of August 6 which adjudged him in contempt for failure to pay alimony *pendente lite.*

Defendant appealed here from the decree of June 2, 1953, and also from the order of August 6 adjudging him in contempt, and the order of August 22.

It is the law of Maryland that any misconduct of a husband that endangers his wife's health to a degree rendering it physically or mentally impossible for her to properly discharge the marital duties constitutes cruelty within the meaning of the divorce statute. Moreover, any misconduct of a husband that renders the marital relation intolerable and compels the wife to leave him may justify a divorce on the ground of constructive desertion, even though the misconduct may not justify a divorce on the ground of cruelty. Any misconduct of a husband that makes it impossible for his wife to live with him without loss of her health and self-respect, or gives her reasonable apprehension of bodily injury, will justify her in leaving him. *Scheinin v. Scheinin,* 200 Md. 282, 89 A. 2d 609; *Lent v. Lent,* 202 Md. 240, 96 A. 2d 14; *Rosenthal v. Rosenthal,* 202

Md. 375, 96 A. 2d 500. But in this case there is no evidence that defendant was guilty of misconduct. There is no charge of infidelity, and no charge of cruelty. There is no charge even of rudeness, or the use of profane and abusive language, or sallies of passion, which of themselves are not sufficient to warrant a divorce. Even when complainant told her husband that she had decided to leave him, she found no fault with him until shortly before she deserted. Her excuse was that she had lost her love for him.

Unquestionably the burden of proof is on the complainant to sustain the allegations of the bill of complaint by fair preponderance of testimony. *Porter v. Porter,* 168 Md. 296, 304, 177 A. 464; *Hamren v. Hamren,* 180 Md. 692, 26 A. 2d 381. In this case complainant failed to sustain the burden of proof. There is no denial, of course, that complainant became bored with her work as statistician. But she had taken that position before her marriage, and she knew that the man she married was a struggling young lawyer. Defendant appreciated that she was tired of her work, and that she had become fatigued and petulant, but he did all he could to alleviate the strain upon her. Defendant's mother testified: "He taught her how to cook. * * * He helped her with the dishes. * * * He helped her with the household laundry on Saturday. * * * He helped her with the shopping."

Complainant attempted to show that she was justified in deserting her husband because he was not affectionate. "I was so miserable living with him," she testified, "because he showed me no attention. * * * He was completely absorbed in himself and his books. * * * He couldn't seem to understand it. He was happy. He didn't see why I was so upset about it." It is true that defendant did devote more time to his work in the second half of their year together, when he was studying accountancy, than in the first half. However, his wife encouraged him to take the course, and he worked late at night with the hope of eventually increasing his in-

come and making it possible for her to stop working.

The charge that defendant was not affectionate was denied by a number of witnesses. One of his sisters testified: "They were both most affectionate, and most demonstrative, to the extent that my husband and I * * * commented in a jest, so as not to offend either of them, that we were sometimes a little embarrassed to the extent of their caresses in the presence of the rest of us."

Another sister testified: "Well, * * * she always bragged a great deal about him, the things he did, how well he was doing in the school he was going to, and about the things he did around the house, how he helped her, and she was always bragging about him. * * * He helped her with washing the clothes on Saturady, and hanging them up, and helped her with the dishes and the cooking and cleaning."

Complainant insisted that her husband refused to have sexual intercourse with her during the period of one month between February 20, 1952, when her parents brought her back to Baltimore, and March 20, 1952, when she finally deserted. The law is established in Maryland that permanent refusal of either the husband or the wife to have sexual intercourse with the other spouse, from no consideration of health or other good reason, constitutes matrimonial desertion, even though the parties continue to reside in the same house. But, of course, the complainant has the burden of proving the allegation that the defendant refused to fulfill the marital duty. *Fleegle v. Fleegle,* 136 Md. 630, 110 A. 889; *Miller v. Miller,* 153 Md. 213, 138 A. 22; Timanus *v. Timanus,* 177 Md. 686, 10 A. 2d 322; *Kelsey v. Kelsey,* 186 Md. 324, 46 A. 2d 627; *Lent v. Lent,* 202 Md. 240, 96 A. 2d 14.

In the instant case defendant swore positively that he did not refuse sexual intercourse, but that it was his wife who refused. There is no evidence to substantiate complainant's charge that her husband permanently refused to have sexual intercourse with her. On the contrary,

the record supports the conclusion that defendant was kind, considerate, indulgent and affectionate. It is also significant that complainant never complained to any of her physicians about her sexual life until shortly before she deserted her husband. The conclusion is therefore irresistible that complainant deserted her husband, not because of any actual lack of affection on his part, but because of her own emotional instability. There is evidence that she was highly sensitive, that she demanded perfection in everyone, that she was easily annoyed by trifles, that she was extremely critical of her friends. These manifestations indicate that her dissatisfactions and resentments were due to psychological causes, rather than to her husband's alleged lack of affection. As complainant's allegation of constructive desertion is not supported by the evidence, the award of the divorce *a mensa et thoro* must be reversed.

Because of this decision, the order for the sale and division of jointly owned personal property must likewise be reversed. Since 1947 it has been the law of this State that whenever a Court of Equity shall grant either a divorce *a mensa et thoro* or a divorce *a vinculo matrimonii*, it shall have the power to hear and determine all questions which may arise between the parties to such proceeding in connection with the ownership of personal property (except chattels real) held, possessed or claimed by either or both of them, and shall have the power to make a division of such property between them, or order a sale thereof and a division of the proceeds of such sale, or make such other disposition thereof as the Court may deem proper. Laws 1947, ch. 220, Code 1951, art. 16, sec. 38. It is still the law that a court of equity has no authority to adjust the property rights of a husband and wife in the absence of specific statutory authority. *Dougherty v. Dougherty,* 187 Md. 21, 48 A. 2d 451; *Blair v. Blair,* 199 Md. 9, 85 A. 2d 442; *Brown v. Brown,* 199 Md. 585, 87 A. 2d 626; *Hull v. Hull,* 201 Md. 225, 232, 93 A. 2d 536.

There is no evidence that the chancellor's award of the sum of $300 as counsel fee to complainant's attorneys was unreasonable. This part of the decree will therefore be affirmed.

Finally, defendant contended that, while the order of August 22 revoked that part of the order of August 6 which adjudged him in contempt of Court for failure to pay alimony *pendente lite*, it did not revoke the adjudication of contempt for failure to pay permanent alimony. He asserted that the orders of August 6 and August 22 hang over him like a cloud, and inasmuch as he has paid all arrearages of permanent alimony, he is entitled to have the cloud removed. Defendant's attorneys explained that they petitioned the chancellor for a stay of permanent alimony pending appeal to the Court of Appeals, and that they never received any notice that the chancellor had reached a decision on their petition, and that it was for that reason that defendant was in arrears in the payment of alimony.

Maryland recognizes that the obligation to pay alimony in a divorce proceeding is not a mere debt, but a duty growing out of the marital relation and resting upon sound public policy. Hence, such an obligation may be enforced in this State by attachment of the person for contempt, and the husband may be imprisoned unless he can purge himself of the contempt by paying or by showing that he has neither the estate nor the ability to pay. *Dickey v. Dickey,* 154 Md. 675, 681, 141 A. 387, 58 A. L. R. 634; *Oles Envelope Corporation v. Oles,* 193 Md. 79, 92, 65 A. 2d 899.

However, where a husband has been ordered to pay alimony, and his wife complains that he has failed to pay in accordance with the order, it is not proper for the court to adjudge him guilty of contempt until after he has been given notice of the complaint and a reasonable opportunity to be heard. *Cf. Rakar v. Clapper,* 203 Md. 265, 100 A. 2d 643; *Sheets v. City of Hagerstown,* 204 Md. 113, 102 A. 2d 734. In any event, even if defendant was guilty of contempt, he purged him-

self of it by paying all alimony in arrears. In justice to him the adjudication of contempt should be revoked.

> *Decree reversed in part and affirmed in part, and orders reversed, and case remanded for the passage of a decree in accordance with this opinion, the costs to be paid by appellant.*