677 A.2d 584

**Robert D. LYNCH,**

v.

**Susan M. LYNCH.**

**No. 55, Sept. Term, 1995.**

Court of Appeals of Maryland.

June 10, 1996.

Evelyn O. Cannon, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General; Angela M. Eaves, Assistant Attorney General, on brief), Baltimore, for Petitioner.

Geraldine Kenney Sweeney, Assistant Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for Respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

BELL, Judge.

■ This case presents for our resolution the issue of the sufficiency of the evidence that Susan M. Lynch, the respondent, was unable to pay the court-ordered child support to comply with the purge provision set by the Circuit Court for Montgomery County [1] and the propriety of the trial court

---

1. The petitioner's *certiorari* petition asked the court to decide "whether an alleged contemnor has the burden of proving his or her inability to comply with the purge provision in order to avoid imprisonment." That issue no longer needs to be decided since, at oral argument, the respondent wisely conceded that the burden is on the contemnor. That fact is well established by Maryland law, *see, e.g., Soldano v. Soldano,* 258 Md. 145, 146, 265 A.2d 263, 264 (1970) ("imprisonment may be voided by showing that one has neither the money nor the ability to pay"); *McDaniel v. McDaniel,* 256 Md. 684, 692–93, 262 A.2d 52, 57 (1970) ("the alleged contemnor '... has the burden of showing his inability to comply and that his situation is in good faith and not due to calculated and deliberate choice.'") (quoting 2 W. Nelson, Divorce and Annulment § 16.25 at 440 (2nd ed.1961)); *Speckler v. Speckler,* 256 Md. 635, 636, 261 A.2d 466 (1970); *Johnson v. Johnson,* 241 Md. 416, 420, 216 A.2d 914, 917 (1966) ("Until [the contemnor] was given an opportunity to show that he had neither the estate nor the ability to pay his obligation and failed to make such a showing, he should have not been incarcerated. The purpose of imprisonment for contempt is to compel compliance with a court order but where the person alleged to be in contempt can establish a valid defense, such as the unintentional inability to obey the order, imprisonment is not proper."); *Oles Envelope Corp. v. Oles,* 193 Md. 79, 92, 65 A.2d 899, 905 (1949). *See also Kerr v. Kerr,* 287 Md. 363, 370, 412 A.2d 1001, 1005 (1980) (burden of proof on contemnor to prove inability to comply with previous order); *Schwartzman v. Schwartzman,* 204 Md. 125, 135, 102 A.2d 810, 815 (1954). *Turner v. State,* 307 Md. 618, 624–31, 516 A.2d 579, 582–86 (1986) is consistent in that the burden is placed on the probationer to prove an inability to comply with condition of probation. This is also the law in our sister jurisdictions. *See, e.g., Ex Parte Capps,* 396 So.2d 70, 71 (Ala.1981) ("proving inability is a defensive matter, the burden of which rests on the contemnor."); *Hopp v. Hopp,* 279 Minn. 170, 156

holding the respondent in contempt of court. The Court of Special Appeals held, as to the former, that the evidence was insufficient to prove the respondent's ability to comply, but as to the latter, that the court did not abuse its discretion. *Lynch v. Lynch,* 103 Md.App. 71, 80–82, 652 A.2d 1132, 1136–38 (1995). Accordingly, it affirmed the contempt finding, and reversed the sanction imposed, *i.e.,* the incarceration of the respondent until she complied with the purge provision the court had set. We granted cross-petitions for certiorari. We shall affirm in part and reverse in part.

I.

The respondent and Robert D. Lynch, the petitioner, divorced in 1987. At that time, the respondent was awarded custody of the parties' two minor children. Subsequently, however, the circuit court modified the decree, terminating the respondent's custody of the children and transferring it to the petitioner. The court also ordered the respondent, who was then working as a receptionist for the United States Government, National Institutes of Health (NIH), earning $460 per week,[2] to pay $150 per month child support, initially through an earnings withholding order, payable through the court's

---

N.W.2d 212, 217 (1968) (same); *Houtchens v. District Court,* 122 Mont. 76, 199 P.2d 272, 274 (1948) ("lack of ability to perform is a defense to be advanced and to be proved by the accused...."); *Katz v. Katz,* 113 N.J. Eq. 75, 166 A. 176 (1933) ("To succeed in this defense [that his failure to obey was due to his inability to obey] he must prove—the burden is his—that his inability was real...."); *Ex Parte Chennault,* 776 S.W.2d 703 (Tex.Ct.App.1989); *King v. Dept. of Social and Health Services,* 110 Wash.2d 793, 756 P.2d 1303, 1310 (1988). *See also Maggio v. Zeitz,* 333 U.S. 56, 75–76, 68 S.Ct. 401, 411, 92 L.Ed. 476, 490–91 (1948); *Cutting v. Van Fleet,* 252 F. 100, 102 (9th Cir.1918) ("It is true that, in cases of civil contempt for failure to comply with an order to pay money, the defendant may show in defense that he is financially unable to comply.").

2. In the respondent's brief, her income is reported to have been $460 per month. This is an obvious miscalculation. The respondent testified that she was paid $11.49 an hour. For a 40–hour work week that would amount to $460 per week.

Child Support Enforcement Division.[3] The respondent immediately fell behind in the support payments. As a result, the support enforcement division initiated contempt proceedings, pursuant to which the court issued an order requiring the respondent to show cause why she should not be held in contempt. Over the course of the next two and one-half years, the show cause hearing was continued eight times, at the respondent's request, and on one occasion, she failed to appear. When a hearing finally was held the respondent had made only one support payment and was, therefore, $5,680 in arrears.

The only testimony presented at the hearing was by the respondent. She admitted that she was working when she was ordered to make child support payments and that she continued in that employment for almost a year thereafter. She quit her job, she explained, to care for her mother, who "got very sick and because of personal problems at home, etc." She continued to care for her mother until she died. Although testifying to having pursued some job opportunities, the respondent acknowledged that she had remained largely unemployed since August of 1991. She noted that she had a few miscellaneous jobs like yard work or flower delivery. The only applications for jobs to which she testified were to discount retail stores. The respondent maintained that she had no assets, and that she did not receive public assistance, social security, workers' compensation, or any other such benefits. Moreover, she testified that she did not own a car, had no bank accounts or valuables of any kind and, except for the $20 that she had in her possession, she had no money. With respect to her living arrangements, the respondent advised the court that she lived rent free in the home of her deceased mother and received free food from a charitable organization called Mana. She also testified that she did not have title to her mother's home, rather, it had been be-

---

**3.** No payments were made pursuant to the order because, according to the respondent, of a miscommunication between the court and her employer.

queathed to her children and "the parental guardian," *i.e.*, the petitioner. Although she said she intended to contest the will, she recognized that, unless she was successful, she would not have title to the house.

The petitioner did not cross-examine the respondent, nor did he offer evidence in contradiction of the respondent's testimony. Instead, he argued that the respondent presented a "classic involuntary impoverishment case," observing:

> She doesn't work, she obviously doesn't have to work. She can meet her needs by some other way. I can't get to any of her assets because she doesn't legally own anything. In terms of this piece of property, it would be nice if we had a judgment, we could go after the property, but she doesn't own the property and she won't do anything to get the estate moving along.

The trial court held the respondent in contempt and entered a judgment against her for $5,680.[4] It sentenced her to 20 days in the detention center, but ordered that she could purge herself of the contempt by paying $500. While recognizing that the respondent did not have $500 in cash or assets from which that amount could be acquired, the court nevertheless determined that she had the ability to purge herself of the contempt. The basis of that determination was its finding that she led a "discretionary lifestyle ... and in the process of it you don't pay support that you have the ability to pay." The court admonished the respondent about the importance of her obligation to make "support payments" and that she must "face" and "deal with" the fact that she has to "go out and make some money" to care for her children. The court also commented that the respondent at one time held "a job paying you $24,000 a year, that was a darn good job and you just left it."

---

4. Neither party to this lawsuit has challenged the money judgment. We note that the court has the authority to impose a judgment pursuant to Rule 2–648, which states, in pertinent part, "[w]hen a person fails to comply with a judgment mandating the payment of money, the court may enters a money judgment to the extent of any amount due."

The respondent moved for reconsideration. At that time, the trial court explained what it had meant by "discretionary lifestyle":

many defendants in criminal cases are indigent and qualified for and are in fact represented by the Public Defender's Office, but those are—not all, but many of them are people who live in a place or a home where somebody else pays their bills, and they actually physically show up in court—they either take a bus or they might borrow somebody's car, some of them smoke, they can get cigarettes, they don't live a luxurious lifestyle, but they are able to live, they stay alive, they have some discretion, they have—nobody else has any obligation to support them, but other people do. So, it allows people, some people, an option in their lives that other people don't have, and they put this term "Discretionary lifestyle" on it. So that is where I got it from. It is not something that I thought up. I apply it to many people come in as URESA cases.

This is a woman who, as I remember, at one time [was paid] 30 or $40 thousand dollars,[5] working for the United States government, and for one reason or another she decided it wasn't good—I think maybe she wanted to stop the job to come home and take care of her mother, when her mother was sick, and she did, and she lives in her mother's home, who is now deceased, apparently there are some other matters going on. She lives rent-free. Regardless of whether she is going to have ownership in this property, she lives rent-free. She gave me a couple of letters from a couple of places that have supplied her food. I am not sure if one was a church, but those, as I recall, and I could be wrong, because I don't have them here, but they were 1991 and 1992; not recent. I think she told me—you said you made the tape—maybe other people help her and allow her to eat and provide food for her so she can stay alive, and I applied that principle. It is a discretionary

---

**5.** The actual amount the respondent was paid was, as the court said at the contempt hearing, $24,000.

lifestyle. It is a lifestyle that she has that isn't luxurious, she is not living the life of Riley, but she is alive, she makes no money. If she lived in a place where she had no friends, she had no family, she had no support, she would either have to go to work and make money to live or she would die, and that is what I imposed on her and that is why I said that I found as a fact that she had the present ability to purge herself. Not because she had $500 in her pocket.

These other people who help her have no obligation to pay her child support; nobody else does except her, but because of this, quote "Discretionary lifestyle," she had the present ability to get the money to pay it. That is what I found as a matter of fact and I am going to stick to it. Until somebody says that discretionary lifestyle that we have talked about doesn't apply to this situation, I am going to stick to it.

The court was emphatic that it had not found that the respondent had voluntarily impoverished herself. It also made clear what it meant when it indicated that she had the ability to purge herself of the contempt:

... I don't think she did have $500 in her pocket, I don't think she did, but I think because of the lifestyle that she leads, has it available to her to purge herself. I found that as a fact.

## II.

In this State, the basic criteria applicable to civil contempt proceedings, as well as the purpose of such proceedings, are well settled. As to the former, where "(1) the complainant is ... a private person as opposed to the State; (2) the contempt proceeding is entitled in the original action and filed as a continuation thereof as opposed to a separate and independent action; (3) holding the defendant in contempt affords relief to a private party (4) the relief requested is primarily for the benefit of the complainant; [and] (5) the acts complained of do not of themselves constitute crimes or conduct by the defendants so wilful or contumelious that the court is impelled to

act on its own motion," the proceeding ordinarily is one for civil contempt. *Winter v. Crowley,* 245 Md. 313, 317, 226 A.2d 304, 307 (1967), citing *Knaus v. Knaus,* 387 Pa. 370, 127 A.2d 669, 673 (1956). *See also State v. Roll & Scholl,* 267 Md. 714, 729–30, 298 A.2d 867, 877 (1973). With respect to its purpose, we have made clear that "[a] civil contempt proceeding is intended to preserve and enforce the rights of private parties to a suit and to compel obedience to orders and decrees primarily made to benefit such parties. These proceedings are generally remedial in nature and are intended to coerce future compliance." *Id.* at 728, 298 A.2d at 876.

The conduct which precipitates the initiation of contempt proceedings is the alleged failure, in contravention of a court order, to do that which has been ordered done or the doing of that which is prohibited. When that conduct has been proven, the defendant may be held in contempt. But, because the intended purpose of the proceedings is remedial—intended to benefit the other party to the action by compelling the defendant to obey the court order—finding the defendant in contempt may not suffice. If the proceedings are to have the desired effect, there must be a means of forcing the defendant to conform his or her conduct to what the court order requires, to force the defendant to obey the court order. Such a means is available when, in addition to entering a contempt finding, the court is able to impose penalties designed to achieve that effect and which, in fact, make the achievement more likely. Imprisonment is such a penalty. Thus, notwithstanding that the proceedings are civil in nature, a defendant may be imprisoned for civil contempt. *Id.* at 729, 298 A.2d at 876.

In the case of civil contempt, the purpose of imprisoning the contemnor is remedial. Therefore, because the purpose of the proceedings defines and limits the penalties that may be imposed, before the contemnor may be imprisoned, he or she must have an opportunity to purge the contempt, that is to say, he or she must have the keys to the prison in his or her pocket. *In re Nevitt,* 117 F. 448, 459 (8th

Cir.1902). Thus, any sentence of imprisonment entered following a finding of civil contempt must provide for purging. *Rutherford v. Rutherford,* 296 Md. 347, 355, 464 A.2d 228, 232–33 (1983); *Roll & Scholl,* 267 Md. at 728, 298 A.2d at 876; *Elzey v. Elzey,* 291 Md. 369, 374–75, 435 A.2d 445, 447 (1981).

A "provision for purging" or the "opportunity for purging" relates to affording the defendant "the chance to rid him or herself of guilt and thus clear himself of the charge." *Herd v. State,* 37 Md.App. 362, 365, 377 A.2d 574, 576 (1977). According to Black's Law Dictionary 1236 (6th Ed.1990), to "purge" is "[t]o cleanse; to clear. To clear or exonerate from some charge or imputation of guilt, or from a contempt." Criminal contempt proceedings offer a decided contrast. The object of those proceedings is to punish the contemnor for past misconduct which, unlike in the case of civil contempt, may not necessarily be capable of remedying. The penalty imposed in such cases need not provide a purging provision; it may be purely punitive. *Roll & Scholl,* 267 Md. at 728, 298 A.2d at 876.

Before the defendant may be imprisoned, of course, the defendant must have been held in contempt, as indicated. That requires proof, by the petitioner, that the defendant acted in contradiction of the applicable court order. In the case of a court order prescribing, or prohibiting, a specified course of conduct, the petitioner must establish that the defendant did or failed to do what was required. Where the order requires the payment of money, he or she has to prove that it was not paid. Moreover, because the purpose of civil contempt proceedings is to coerce future compliance, *id.,* the defendant must have been fully capable of having complied; in addition, the ability to perform the act required by the court order must have been within the power of the defendant. *Elzey,* 291 Md. at 374, 435 A.2d at 447 (quoting *Williams & Fullwood v. Director,* 276 Md. 272, 313, 347 A.2d 179, 201 (1975)), *cert. denied,* 425 U.S. 976, 96 S.Ct. 2178, 48 L.Ed.2d 801 (1976). *See People v. Razatos,* 699 P.2d 970, 974 (Colo.

1985). "The 'choice' must be the defendant's 'as to whether [he can] comply.'" *Elzey,* 291 Md. at 374, 435 A.2d at 447.

The latter requirement, whether or not the defendant is able to comply with the court order is, however, a matter of defense. *Johnson v. Johnson,* 241 Md. 416, 420, 216 A.2d 914, 917 (1966). In "The Indigent Defendant's Right To Court–Appointed Counsel In Civil Contempt Proceedings For Non Payment Of Child Support Payments," 50 U. Chi.L.Rev., 326, 338 (1983), the point was made:

> Inability to comply is a complete defense. Proof of ability to comply requires a showing that the defendant had a resource to meet the court-ordered payments, allowing a reasonable amount for his own subsistence. If he has the means to comply, the court is justified in reordering his priorities by applying coercive measures. The court exceeds its powers, however, if it confines a man on the ground either that he is healthy and able to work or that he could prevail upon relatives to pay the sums required for his release.

We made a similar point in *Johnson,* 241 Md. at 420, 216 A.2d at 917:

> "The purpose of imprisonment for contempt is to compel compliance with a court order but where the person alleged to be in contempt can establish a valid defense, such as the unintentional inability to obey the order, imprisonment is not proper."

Where the order is one prescribing or prohibiting a specified cause of conduct, the required defense showing is that the defendant is unable to conform his or her conduct in compliance with the court order. Where the order calls for the payment of money, the defendant is entitled to the "opportunity to show that he [or she] had neither the estate nor the ability to pay his [or her] obligation." *Id.* In that situation, "[m]oreover, the issue is not the ability to pay at the time the payments were originally ordered; instead, the issue is his present ability to pay." *Elzey,* 291 Md. at 374, 435 A.2d at 448. Only if he or she fails to show such inability is a finding

of contempt and subsequent imprisonment permitted. *Id.* *See McDaniel v. McDaniel,* 256 Md. 684, 692–93, 262 A.2d 52, 57 (1970); *Speckler v. Speckler,* 256 Md. 635, 637, 261 A.2d 466, 467 (1970); *Schwartzman v. Schwartzman,* 204 Md. 125, 135, 102 A.2d 810, 815 (1954); *Oles Envelope Corp. v. Oles,* 193 Md. 79, 92, 65 A.2d 899, 905 (1949); *Dickey v. Dickey,* 154 Md. 675, 681, 141 A. 387, 390 (1928).

 Proof of inability to comply, however, does not guarantee immunity from imprisonment. In *Roll & Scholl,* the Court explained:

> Situations may arise where at a hearing held pursuant to an order to show cause in what properly began as a civil contempt, facts are presented which indicate that the alleged contemnor cannot comply with the order of the court that directed him to perform an act for the benefit and advantage of another party to the suit. If this inability to comply was caused by a deliberate effort or a wilful act of commission or omission by the alleged contemnor committed with the knowledge that it would frustrate the order of the court, the civil contempt proceeding should be terminated and new proceedings may be instituted which can result in a finding of criminal contempt.

267 Md. at 730, 298 A.2d at 877.

Although this Court recognized in *Johnson,* a civil contempt case, that there are valid defenses to a charge of contempt— we pointedly did not specify civil contempt, 241 Md. at 420, 216 A.2d at 917—the example we gave was the "unintentional inability to obey the order." Nothing in that case suggests that the Court intended to limit the defenses that would be valid in contempt proceedings. Subsequent cases belie such an intention. In *Elzey,* also a civil contempt case, we considered another example of a valid defense to a contempt proceeding—intentional inability to obey the order. *See* 291 Md. at 375–76, 435 A.2d at 448 (quoting *Roll & Scholl,* 267 Md. at 730, 298 A.2d at 877). The context of that case made clear that such intentional inability is a defense limited to civil contempt proceedings. *Id.* Read together with *Elzey,* there-

fore, it would appear that *Johnson*'s reference to "unintentional inability to obey" was no more than it purported to be, an example of a valid defense. As the respondent correctly argues, "the statement in *Johnson* can be read to mean that inability to pay precludes imprisonment for civil contempt and an unintentional inability to pay precludes imprisonment for either civil or criminal contempt." The Respondent's Brief at 13.

Furthermore, the goal of civil contempt proceedings, to coerce compliance with a court order entered primarily for the benefit of private parties to a suit, cannot be accomplished when the responsible party is unable, for whatever reason, to comply. The same is true in the case of court-ordered child support payments. If the responsible party does not have the money, or any means of obtaining it, payment cannot be coerced. Indeed, this is true whether the responsible party chose intentionally to frustrate the court order, as, for example, acting in bad faith, to impoverish him or herself, or whether his or her inability is unintentional.

Although primarily focused on the imprisonment aspect of the analysis, rather than the proof of contempt, both *Johnson* and *Elzey* are instructive. In *Elzey*, the petitioner, a plumber, was required by a divorce decree, incorporating a settlement agreement, to pay his former wife weekly support. A little more than a year after the decree was entered, he informed his former wife that he was retiring and therefore would be financially unable to continue the payments. She initiated civil contempt proceedings. The petitioner produced evidence in support of his financial inability to meet his support obligation. His testimony explained why he retired, he "wasn't able to get out and do the work that [he] had done years before," he could not make enough money to pay his overhead, he was "going behind every month, and . . . he 'could not see any other way out.'" 291 Md. at 372, 435 A.2d at 446–47. Although noting that the petitioner had been able to pay his former wife the support payments required when the agreement was originally made, but that "the circumstances

changed," so that, since his retirement, the petitioner became financially unable to pay, the trial court found the petitioner in contempt and expressed the view that "I have to send you to jail." *Id.* at 373, 435 A.2d at 447. While it made no finding that the petitioner retired in order to escape his court ordered obligation to his former wife—it found, to the contrary, that he retired because he had reached the age at which most people retire—the trial court opined, "because the petitioner's financial inability resulted from his own decision to retire, this case fell outside of the principle that one may not be imprisoned in a civil contempt case for failing to make support payments if one has neither the assets nor the ability to pay." *Id.*

Agreeing with the trial court that the petitioner had become unable to pay the arrearages as well as the continuing weekly support payments, this Court held that the "petitioner should not have been sentenced to jail." *Id.* at 375, 435 A.2d at 448. Moreover, we rejected the trial court's belief that a jail sentence was required because the petitioner voluntarily retired, thus placing himself in a position of financial inability. Relying on *Roll & Scholl*, 267 Md. at 730, 298 A.2d at 877, we also pointed out that, had the trial court found that the petitioner retired in bad faith or to defraud his former wife or to deprive her of her support, that finding would not have justified a civil contempt jail sentence, although one for criminal contempt may have been in order. The judgment of the Court of Special Appeals affirming the judgment of the Circuit Court for Dorchester County was reversed. *Elzey*, 291 Md. at 376, 435 A.2d at 449.

In *Johnson*, the issue was again whether the petitioner should have been incarcerated for contempt. We noted that "[w]hether or not the father was subject to incarceration depends on whether he was able to meet the obligation imposed on him by the *support order*." 241 Md. at 419, 216 A.2d at 916 (emphasis added). Having concluded that the record seemed to indicate that the petitioner was unable to meet his obligations because he had neither sufficient estate nor an ability to pay, we remanded the case for a hearing on the petitioner's petition to reduce the support payments and

for the "introduction of evidence as to his present ability to meet his obligations." *Id.* at 420, 216 A.2d at 917.

## III.

## A.

The petitioner argues that the respondent failed to meet her burden of proving her inability to comply with the court-ordered support order. It thus urges affirmance of the contempt finding. Although he does not specifically cite *Johnson*, 241 Md. at 420, 216 A.2d at 917, for the proposition, he, like the Court of Special Appeals, *see* 103 Md.App. at 80, 652 A.2d at 1136, believes that the only available defense, hence the showing the respondent had to make, was her "unintentional inability to pay the court ordered support." So it is that the petitioner contends that the inability proven must be "in good faith and not due to calculated and deliberate choice." *McDaniel*, 256 Md. at 692, 262 A.2d at 57. Accordingly, the party alleged to be in contempt, the petitioner submits,

cannot be compelled to work and earn the wherewithal to meet the court's mandate if he is physically or for other good reason unable to do so. On the other hand, he will not be permitted to succeed on a defense of inability to comply where he has chosen his own situation and declines to make any reasonable effort to employ his earning capacity in other directions. Nor can he arbitrarily sit back and refuse to work when he has the capacity for gainful employment.

*Id.* at 693–94, 262 A.2d at 57–58 (quoting *Hopp v. Hopp*, 279 Minn. 170, 156 N.W.2d 212, 218 (1968)). Indeed, whether non payment is in good faith and not with deliberate disregard of the support order requires consideration of the defendant's "ability to perform labor; his opportunity to find gainful employment; his disposition and will to earn money and contribute a reasonable amount to his family's support, and his diligence in seeking employment. . . ." *Id.* at 693, 262 A.2d at 57 (quoting *Hopp*, 156 N.W.2d at 217–18).

Focusing, as did the Court of Special Appeals on the entirety of the period between the passage of the support

order and the contempt hearing, *see Lynch,* 103 Md.App. at 79, 652 A.2d at 1136, the petitioner believes that there is ample evidence in the record to sustain the circuit court's contempt finding. He agrees with that court that, given her discretionary lifestyle, the respondent did not meet her burden to prove herself incapable of complying with the support order. The petitioner explains:

> Clearly the trial judge considered Ms. Lynch's testimony and concluded that she had chosen a discretionary lifestyle that did not require her to obtain employment. Ms. Lynch voluntarily left her job, was able to have housing and food provided at no cost, had made no effort at settling her mother's estate, and had only recently started a less than comprehensive effort at seeking employment. Based on this uncontroverted evidence, the trial court did not find Ms. Lynch's failure to comply with the support order an unintentional or unavoidable act; rather, he found that she chose a lifestyle in which she was cared for by others and was not required to earn any money for herself or her children. That deliberate choice resulted in Ms. Lynch's alleged inability to comply with the support order. The trial court certainly acted within its discretion in concluding that Ms. Lynch's lifestyle choice did not excuse compliance with the support order.

The Petitioner's Reply Brief at 4–5. The petitioner submits that there is a fundamental difference between inability to pay a purge amount and inability to comply with a support order. A finding with regard to the former does not necessitate, in his view, a consistent finding with respect to the latter.

### B.

Next, the petitioner argues that assessed in light of the fact that it is the respondent's burden to establish inability to pay the purge amount, the evidence of inability to comply was insufficient and, thus, the Court of Special Appeals must be reversed. In the petitioner's view, the respondent has left unexplained a number of circumstances, including her ability to pay for public transportation, her ability to pay the taxes on

her mother's house, and the source of the $20 she brought with her to court, which raised serious doubts about her alleged inability to pay the $500 purge amount. That being the case, he submits that the trial court's discretionary finding that the respondent did not meet her burden in that regard is fully supported by the record.

## IV.

### A.

Addressing the latter argument first, we believe that the Court of Special Appeals correctly reversed the purging provision.[6] There is absolutely no evidence in this case on the basis of which it could be concluded that the respondent had a present ability to pay the purge amount. The respondent testified, without contradiction and without cross-examination, that aside from $20, she had no income, or assets, and no way of raising the purge amount. Moreover, the trial court found that she did not have the present financial ability to comply with the purge provision. It made clear, at the hearing on the motion for reconsideration, that the basis for its finding was "not because she had $500.00 in her pocket," or that she could raise it from assets or property she possessed, but because of the respondent's discretionary lifestyle. It was on that basis that the court inferred that the respondent would be able to acquire the monies with which to purge her contempt. Significantly, the court believed that she would get the money from

---

6. The Court of Special Appeals reached its conclusion using a different analysis. The intermediate appellate court believed that the proper focus was on the proof of the respondent's financial ability to comply, rather than her financial inability to comply. In its view, the burden was on the petitioner to prove the former, rather than on the respondent to prove the latter. *Lynch v. Lynch*, 103 Md.App. 71, 82, 652 A.2d 1132, 1137–38 (1995) Having thus allocated the burden, the Court of Special Appeals concluded that the evidence was insufficient to prove the respondent's present ability to comply with the purge provision. It reasoned that proof of present ability to comply cannot be "based exclusively on the disbelief of [the respondent's] testimony that she was not able to pay any more than the twenty dollars ($20) she brought to court with her." *Id.* at 83, 652 A.2d at 1138.

persons who had no legal obligation to support her or her children. Indeed, by resting its fact finding on the discretionary lifestyle rationale, the court necessarily found that the respondent had no present financial ability to comply; rather, she was dependent upon the largess and good wishes of those persons who made her discretionary lifestyle possible, the very antithesis of present financial ability. *See Russell v. Russell*, 559 So.2d 675, 676 (Fla.Dist.Ct.App.1990).

B.

 Neither is the petitioner correct with regard to the contempt finding.

The respondent's testimony was the only evidence bearing on her inability to comply with the court order. That testimony applied equally to the monthly payments, the full amount due under the order, and the purge amount. The trial court found, correctly, we concluded, that that evidence did not establish that the respondent had a present financial ability to comply with the purge provision. We do not believe that the same testimony nevertheless could be sufficient to establish the respondent's ability to comply with the court order.

The Court of Special Appeals and, as we have seen, the petitioner, believe that the present financial inability to comply applies only to the sanction, *i.e.,* the purge provision and not the finding of contempt. In their view, it is enough if the evidence reveals that the defendant could have complied with the order at some time during its life and/or that the defendant's present financial inability to comply is caused by the defendant's bad faith decision and intentional act, orchestrated to frustrate or avoid compliance with the court order. This analysis disregards the important distinction between civil contempt and criminal contempt and, in fact, contributes to the haziness and indistinctiveness, *see Roll & Scholl*, 267 Md. at 728, 298 A.2d at 876, of the line between them. Moreover, it is at odds with the analysis employed in *Roll & Scholl.*

 Whether a defendant has failed to pay court ordered support when he or she had the ability to do so and

whether that defendant has, in bad faith, caused his or her own present inability to comply, with the intent of frustrating the court order, are material, and, indeed, necessary, considerations bearing on whether a defendant should be punished. Those considerations do not address whether the defendant is in civil contempt, the object of which is remedial—to force compliance. Even if the present inability to comply is the product of the defendant's bad faith, compliance still cannot be coerced by civil contempt. Thus, to the extent that this record reflects that the respondent failed to pay the court-ordered support when able and quit her job in bad faith, for the purpose of avoiding the responsibility and, in the process frustrated the court order, the petitioner could have, and should have, initiated criminal contempt proceedings, for the purpose of punishing the respondent for those acts. That would, of course, have required the termination of the civil contempt proceedings. *See Elzey,* 291 Md. at 375, 435 A.2d at 448; *Roll & Scholl,* 267 Md. at 730, 298 A.2d at 877.

Furthermore, merely finding a defendant in contempt of court does not ordinarily further the purpose of coercing future compliance with the court order. Indeed, a finding of contempt, where there is no possibility of enforcing compliance with the court order to which it relates, simply labels the defendant a contemnor and imputes guilt to him or her. That is a form of punishment. *See Herd,* 37 Md.App. at 364–65, 377 A.2d at 576 ("the contemner [sic] must be afforded the chance to rid himself of guilt and thus clear himself of the charge. To suspend the sentence and allow the conviction to stand falls well short of the mark."). As our cases recognize, civil contempt requires a purge provision with which the defendant is able to comply in order to purge, *i.e.,* clear or exonerate, him or herself of the contempt. Where, based on past acts and/or the defendant's lack of good faith compliance with the court order, a finding of contempt is permitted to stand, the defendant is denied any opportunity to purge the contempt.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED AS TO THE PURGING PROVISION AND*