JOHN C. GREEN *v.* GARNETT BEATRICE GREEN

[No. 168, September Term, 1979.]

*Decided November 8, 1979.*

The cause was argued before THOMPSON, MOYLAN and WILNER, JJ.

*Weldon Leroy Maddox* for appellant.

*Michael D. Steinhardt* for appellee.

WILNER, J., delivered the opinion of the Court.

John and Garnett Green mutually plighted their respective

---

troths on October 8, 1948. On May 22, 1954, their union produced Thomas Green, and on April 21, 1955, it produced his brother Herman.[1] The parties separated in 1961 and did not cohabit together thereafter. Mrs. Green (appellee) sued Mr. Green (appellant) for divorce in 1968, but, because of fiscal constraints, was unable to prosecute her action until 1971.

At least part of her financial problem was apparently due to the failure of appellant to provide support for her or the minor children in her care. At some point, the awesome power of the State of Maryland was invoked, for, on August 31, 1970, the Criminal Court of Baltimore, in a criminal non-support action, placed Mr. Green on probation, conditioned upon his paying, through the court's probation department, the sum of $1,150 per year for the support of his wife and two children. The order broke this sum down into $250 for the support of Mrs. Green and $450 for each of the children. Appellant was also directed to amortize his then-current arrearage of $5,661.69 at the rate of $200 a year, payable on December 31 of each year.[2] Payments for Herman were to be sent to one Harry Cox, with whom Herman was then residing.

On November 8, 1971, a divorce decree was entered by the Circuit Court No. 2 of Baltimore City, finally ending the marriage. The decree awarded custody of Thomas and Herman, then 17 and 16 years of age, respectively, to Mrs. Green and directed appellant to pay to Mrs. Green $1,150 per year "for the support and maintenance of said children and Complainant." In addition, appellant was ordered to pay appellee $200 a year "on an outstanding arrearage until such time as said arrearage is brought to date...." Finally, the decree stated that "the matter of alimony shall be reserved for the future determination of this Court."

We thus have a decree that (1) provided an annual lump sum for the support of Mrs. Green and the children, without a

---

1. There were three older children born to the parties as well, but they are not involved in this proceeding.

2. It is not clear whether the court realized that it would take 28 years for appellant to amortize the arrearage at that rate.

breakdown as to how much was for each, (2) made reference to an outstanding arrearage but no specific reference to the earlier order of the Criminal Court and no ascertainment of the then-current amount of arrearage, and (3) notwithstanding its express provision of support for appellee, reserved for future determination the question of alimony.[3]

On February 14, 1973, the equity court ordered appellant to appear before it on March 12, following, to show cause why he should not be held in contempt for "not obeying the Order of this Court passed on the 8th day of Nov., 1971, directing the payment of *Alimony, pendente lite,* by him to the plaintiff. . . ." (Emphasis supplied.) Several things are noteworthy about this Order. The most striking thing, of course, is that it referred only to alimony *pendente lite,* which was *not* the subject of or mentioned in the November 8, 1971, decree. The record does not reveal that a petition was filed by Mrs. Green, or anyone else, seeking this relief, so what the impetus for this peculiar Order was is not at all clear. The order has stamped on it a certificate of the probation department that the arrearage as of February 5, 1973, was $8,151.64 and that nothing had ever been paid on the arrearage, but the certificate does not indicate how much of that arrearage is for "alimony" or spousal support (much less alimony *pendente lite*) and how much is for accrued child support.

Mr. Green is a seaman, and he was apparently either on a voyage, or about to undertake one, but in either event was expecting to be at sea on the day of his scheduled court appearance. On March 9, 1973, his attorney arranged for a postponement of the March 12 hearing on that account, writing to counsel for appellee that appellant would "make a payment on the arrears as soon as possible" and advising that he (appellant) "will be on a 2 month sea trip" but was "supposed to make an allotment to me to take care of the

---

3. It is important to note that the decree was prepared by an equity master based upon testimony taken by him. The transcript of that testimony shows that the master was aware of the Criminal Court order, and the breakdown as between Mrs. Green and the two children that it contained. Indeed, a copy of the earlier order was made an exhibit in the equity case and, we assume, was forwarded to the judge along with the master's file and report.

payments." There is an unsigned handwritten note on the Order itself (not reflected on the true test copy): "3/12/73: By agreement of counsel (W.C. Maddox and M.D. Hyman) case to be postponed until man in case returns from sea trip."

Nothing further transpired until March 9, 1977 — four years later — when the court issued another show cause order. This one, also without benefit of a petition, directed appellant to appear in court on April 6, 1977, to show cause why he should not be held in contempt for disobeying the November 8, 1971, order "directing the payment of *Child Support...*" (Emphasis supplied.) This order also contained a certificate of the probation department with regard to arrearages. As of March 7, 1977, the arrearage shown was $3,050.64, with a statement or indication that nothing had ever been paid on it.

In the normal course of events, the case was referred to the domestic relations master, Miss Lucy Ann Garvey, but, upon appellant's request for a court hearing, the file was returned to the judge on April 7, 1977, pursuant to Supreme Bench Rule 571-D. On May 12, 1977, the court sent it back to the master for hearing. The master, in turn, referred the matter to the probation department for a determination of how much, if any, of the arrearage was due to the Department of Social Services.[4]

On August 23, 1977, Master Garvey filed a report finding, among other things, that (1) at the time of the 1971 decree, the court had no jurisdiction to award alimony, (2) therefore, the contempt proceeding could involve only an arrearage in child support, (3) the amount of that support should be determined in accordance with the 1970 Criminal Court order — *i.e.,* $450 per annum for each child, (3) the support obligation commenced December 31, 1971, (4) Thomas became emancipated on May 14, 1973, and Herman became emancipated on August 31, 1975, (5) the requirement of child support should therefore be suspended as of those dates, (6)

---

4. There was some evidence at that point that appellee had been receiving public assistance for a period of time, and that, as a result, the Department of Social Services may, by subrogation, have been entitled to some part of what was primarily owed to appellee.

appellant was entitled to a credit of $450 for a period of time that Herman was incarcerated, (7) the amount of child support arrearage, taking into account the above factors, was $8,482.74, (8) of that amount, $7,729.64 was due to the Department of Social Services and $753.10 was due to appellee, (9) the amount due to social services should be paid at the rate of $15 a week, and (10) payment could be enforced through contempt proceedings.

Appellant excepted to this report; however, after a hearing before the court, the exceptions were denied, and the findings and directives of the Master were adopted in the form of a court order. It is from that order that this appeal is taken.

### (1) *Power to Punish for Contempt*

The first six issues raised by appellant are consolidated in his one argument that the court erred in exercising (or threatening to exercise) its power to punish him for contempt in order to enforce payment of these arrearages. He begins by suggesting that support should have been terminated as to Thomas and Herman when they reached their eighteenth birthday — *i.e.,* that Laws of Md., 1973, ch. 651, reducing the age of majority from 21 to 18, should be applied with respect to the 1971 divorce decree. Reading that decree in light of what the Court of Appeals said in *Monticello v. Monticello,* 271 Md. 168 (1974), however, we reject that suggestion, and conclude that the obligation of support continued until the earlier of the children's emancipation or 21st birthday.

The real thrust of appellant's argument is that the power to enforce the payment of child support through contempt proceedings ends when the child ceases to be legally dependent — when he attains his majority or is emancipated. Contending that the appellate courts of Maryland have yet to consider this question, he asks that we adopt what appears to be the "majority" rule supporting his contention.

The issue raised here has been considered in a number of other States, and there has developed a substantial split of authority with respect to it. The courts in at least eight States have agreed with the approach urged by appellant,

concluding that once the child attains his majority (or otherwise ceases to be dependent), accrued arrearages of support may not be enforced through contempt proceedings.[5] Five, and possibly six, States have taken an opposite view and have recognized or applied the contempt power as a legitimate means of enforcing the payment of arrearages in a proceeding commenced after the child has become of age or self-sufficient.[6] Most of the cases are reviewed in Anno.: *Power of Divorce Court, After Child Attained Majority, To Enforce By Contempt Proceedings Payment Of Arrears Of Child Support,* 32 A.L.R.3d 888.

Some of the courts have expressed the reasoning behind their decision; some have not. The clearest explanation for the view espoused by appellant was provided in *Fox v. Fox, supra,* footnote 5, 371 N.E.2d 1254, 1255. The court, reviewing the cases establishing what it considered to be the majority rule, stated:

> "The rationale of these decisions is that the court's jurisdiction to enforce support money judgments by the extraordinary remedy of contempt is predicated upon the continued dependency of the children, and the need to insure support for these children during their minority. However, when a child reaches majority, the purpose and justification for this extreme remedy terminates."

The concern of the legislature, said the court, was with the support of *minor* children, not those who had already attained their majority. Debts due to them, or to a parent on their account, could be enforced in more traditional ways. Thus, the power of contempt, "a harsh and extreme sanction ...

5. *See* Fox v. Fox, 371 N.E.2d 1254 (Ill.App. 1978); Corbridge v. Corbridge, 102 N.E.2d 764 (Ind. 1952); Sides v. Pittman, 150 So. 211 (Miss. 1933); Lieder v. Straub, 42 N.W.2d 11 (Minn. 1950); Zieman v. Zieman, 121 N.W.2d 77 (Minn. 1963); Reynolds v. Reynolds, 137 P.2d 914 (Okla. 1943); Dawson v. Dawson, 426 P.2d 614 (Wash. 1967); Halmu v. Halmu, 19 N.W.2d 317 (Wisc. 1945); Gersten v. Gersten, 281 So.2d 607 (Fla.App. 1973).

6. *See* Wasson v. Wasson, 216 N.W.2d 594 (Mich. 1974); State v. Casey, 153 P.2d 700 (Ore. 1944); White v. White, 212 S.E.2d 511, *aff'd* 223 S.E.2d 377 (N.C. 1976); Ex Parte Hooks, 415 S.W.2d 166 (Tex. 1972); Goldberg v. Goldberg, 258 N.Y.S. 588 (1932). *Cf.* Allison v. Binkley, 259 S.W.2d 511 (Ark. 1953).

especially as it concerns the payment of a money decree, should be resorted to only where there is no other reasonable means by which the judgment may be enforced and then not in the first instance." *Id.* at 1255.

The principal rationale on the other side, which has not been articulated quite as well, seems to be that, in the absence of some statutory provision to the contrary, disobedience of a court order to pay child support remains as contumacious after the child loses his dependency as before. The affront to the court is the same. The Michigan court noted as well the element of fairness in *Wasson v. Wasson, supra,* footnote 6, 216 N.W.2d 594, 597. The mother had to expend her own money to maintain the children, and "[i]n all fairness ... should not be denied the use of contempt proceedings as an effective means to enforce her husband's duty to support his children."

Yet another consideration, which may be especially germane in this case, is that if the custodial parent loses the remedy of contempt once the child becomes emancipated or of age, and is left only with the ability to execute judgment on the obligor's property, he or she may be left with no effective remedy at all. An obligor who has little or no property subject to attachment and who is crafty or simply fortunate enough to elude the law's grasp until his children are 18 or on their own may escape his legal and parental obligation entirely. The effect of this, of course, is to impose upon the custodial spouse, or, as in this case, largely upon society, the financial burden that is rightfully and lawfully his without any practical means of redress.

Were this truly a case of first impression in Maryland — were we free to choose between these two opposing points of view unfettered by constraint of statute or judicial authority — we would choose the approach that allows for the continued use of contempt proceedings for the reason last mentioned. We would not consider it sound judicial policy to encourage in any way the evasion of one's legal duty to support his or her minor children; and thus we believe the less restrictive view to be the better one. Fortunately, the same result is indicated both by case law and by statute.

In *McCabe v. McCabe,* 210 Md. 308 (1956), the Court of Appeals *sub silentio* approved the use of the contempt power to enforce payment of child support arrearages long after the children had attained their majority. The principal issue raised in that case was whether a Maryland equity court could assume jurisdiction and enforce through traditional equity powers, including contempt, arrearages accruing under a Nevada decree. As the record extract in that case points out, the children in question were born in 1928 and 1929, respectively. A 1931 Nevada divorce decree obligated the father to pay $40 a month child support and $60 a month alimony. In 1955 — when the children were well over 21 — the mother sued in a Maryland court of equity asking that the court determine an arrearage of $25,890 for "past due alimony and support and maintenance for the two children" and "by suitable decree enforce such rights as might be found to exist in the complainant against the respondent." [7]

Although obviously aware of the fact that the children were then over 21,[8] the Court of Appeals nevertheless held that the contempt power was available to enforce the arrearage, both as to alimony and child support. At page 314, the Court stated:

> "This Court has held that alimony represents a duty and not a debt. . . . In *Oles Envelope Corp. v. Oles,* 193 Md. 79, the Court said that the obligation to pay alimony is not a debt but a duty resting upon sound public policy, and added: 'Hence this obligation may be enforced by attachment of the person for contempt, and the defendant may be imprisoned unless he can purge himself of the contempt by paying or by showing that he has neither the estate nor the ability to pay.' Since the 1950 amendment of Art. III, Sec. 38, Constitution of

---

7. The bill of complaint did not break down the gross arrearage into alimony and child support; but it did allege that the periodic payments as to both were to commence on September 1, 1931, and that only $270 had ever been paid under the decree. It is evident that a very substantial amount of the $25,890 would have been for child support accruing during the minority of the children.

8. *See* 210 Md. at 310. The Court noted in its Opinion that the 1931 decree provided for the child support. The children, if alive in 1931, had to be over 21 in 1955.

Maryland, and the decision in *Zouck v. Zouck,* 204 Md. 285, obligation of support of minor children under a decree would, like alimony, be considered a duty, not a debt. *The public policy of Maryland would seem clearly to permit the relief sought by the wife in this case. . . ."* (Emphasis supplied.)

It is true, of course, that the issue raised here was not discussed by the Court in *McCabe,* and we can therefore point to no language in the Opinion that binds us to one theory or another. But the fact that the Court did approve the full panoply of equity powers, including contempt, knowing that the children had already attained their majority, is obviously significant. We can only assume that the Court knew full well what it was doing and, if it believed that contempt proceedings were inappropriate in such a case, would have said so. *See also Bradford v. Futrell,* 225 Md. 512 (1961).

The *McCabe* decision had one other noteworthy effect. In mentioning, and indeed relying upon, the 1950 amendment to Md. Const., art. III, § 38,[9] the Court made clear that the obligation to pay child support arrearages remained a duty, rather than merely a debt, even after the loss of dependency, and that enforcement of the duty through contempt proceedings would not contravene that Constitutional provision. This is consistent with the plain wording of the Constitutional provision itself which gives no indication whatever that the higher status of a child support order is lost once the dependency is lost.

---

9. Until 1950, art. III, § 38 simply provided that "[n]o person shall be imprisoned for debt." In construing this provision *vis a vis* the authority of a court of equity to enforce support orders by punishment for contempt, the Court of Appeals had drawn a distinction between alimony and child support. Alimony, it said, was considered a duty, rather than a debt, and thus could be enforced by contempt; however, child support did not enjoy that status. It was merely a debt and could not be enforced by imprisoning a defaulting obligor for contempt of court. *See* Bushman v. Bushman, 157 Md. 166 (1929). With an obvious intent to remove that distinction and to place child support on the same elevated plane as alimony the General Assembly proposed (Laws of Md., 1950, ch. 14), and the people ratified an amendment to § 38, adding thereto the words: "but a valid decree of a court of competent jurisdiction or agreement approved by decree of said court for the support of a wife or dependent children, or for alimony, shall not constitute a debt within the meaning of this section."

Reliance upon the 1950 Constitutional amendment in *McCabe* becomes even more significant in light of Md. Annot. Code art. 16, § 66J. Originally enacted in 1955 as part of the then-bastardy laws (Laws of Md., 1955, ch. 427), and retained when paternity actions and the enforcement of child support orders entered in such actions were placed under the jurisdiction of the equity courts (Laws of Md., 1963, ch. 722), that section provides, in relevant part:

> "(a) The orders of court directing payments for the support and maintenance of the child or with respect to any other matter are enforceable in the same manner and to the same extent as other orders of the equity courts of this State, including, but not limited to, citation and imprisonment for contempt. . . ."

> "(d) Any moneys due and unpaid for the support of the child at the time it reaches the age of 18 years, dies, marries, or becomes self-supporting, *shall be a continuing obligation of the party* or parties bound by the order of the court to pay the same, *until finally and completely paid under all the provisions of law applicable to the order."* (Emphasis supplied.)

Section 66J, as noted, deals with paternity cases — with the support of children born out of wedlock. It does not, therefore, directly control the situation before us. But it certainly represents a legislative determination that the use of contempt proceedings to enforce payment of arrearages existing after majority or emancipation is *not* against public policy. Indeed, such method of enforcement is consistent with and in furtherance of the public policy. It would make no sense at all to conclude that the public policy favors enforcement where the child is "illegitimate" but not where he or she is born "in wedlock."

For all of these reasons, we conclude that the court was not without jurisdiction to enforce payment of the child support arrearage through its power to cite and punish for contempt.

### (2) *Laches*

The question here is whether the court properly *exercised* the jurisdiction and authority that we have just concluded it possessed.

The equity order sought to be enforced was entered in November, 1971. The first attempt to enforce it was in February, 1973, but that proceeding was postponed because appellant was at sea. Nothing further was done for over four years, until a second show cause order was issued in March, 1977.

Notwithstanding that the obligation of child support is a duty, rather than merely a debt, the right to collect it may become barred by the doctrine of laches. *Eckard v. Gardner,* 255 Md. 171 (1969); *Weaver v. Garrett,* 13 Md.App. 283, 287 (1971).

Laches, of course, is an equitable defense; its application is not precise and automatic. In judging whether it applies in any given case — and particularly in a case where it might serve to bar the enforcement of a duty recognized by the organic law of the State — we must ever be mindful of what laches is. It was defined by the Court of Appeals in *Demuth v. Old Town Bank,* 85 Md. 315 (1897), this way:

> "Strictly speaking, and using the term as it is understood in the law, laches is such neglect or omission to assert a right as, taken in conjunction with lapse of time more or less great, and other circumstances causing *prejudice* to an adverse party, operates as a bar in a Court of Equity." (Emphasis in the original.)

*See also Hopper v. Brodie,* 134 Md. 290 (1919); *McInnes v. McInnes,* 163 Md. 303 (1932).

It is thus not solely the lapse of time that is involved, but, equally important, the prejudice that results therefrom to the adverse party. In *Marshall v. Marshall,* 164 Md. 107 (1933), for example, the lack of prejudice precluded the application of laches to bar an attempt to collect an arrearage in spousal

and child support accruing over a 26-year period. The Court noted, at page 114:

"It is contended that the appellant has lost by laches her right to enforce the decree under which she claims. The absence of the defendant from the state, and his inability to make the payments, during most of the period since they were discontinued, sufficiently account for the delay in the enforcement of the decree, and, since it finally adjudicated the defendant's liability, he could not be prejudiced in reference to it by the subsequent lapse of time."

In *Kalben v. King,* 166 Md. 632 (1934), the Court considered the application of laches to a long-delayed suit to collect arrearages of alimony *pendente lite.* The order was issued in January, 1924, but the wife did nothing to enforce it until her husband died eight years later, at which point she attempted to collect the arrearage from his estate. The Court said, at page 639-640:

"In this case we are not inclined to look with favor on the claim here made for alimony *pendente lite.* It never was contemplated that temporary alimony should run for eight years. Its purpose is to provide support and suit money for the wife for such time as may be reasonably necessary to carry on to a decree [in] a suit for divorce. *In a pending suit* a reasonable limitation would be the rule of the ecclesiastical court, which limited the period for the recovery of arrears of alimony to one year. *This rule, however, could only be applied to pending suits, as a final decree carries with it the right to recover arrears for twelve years."* (Emphasis supplied.) [10]

---

10. In support of the last sentence, the Court cited Marshall v. Marshall, *supra,* 164 Md. 107. It should be noted that the Court later determined that the wife had abandoned her suit for divorce and thus was not entitled to alimony *pendente lite* in any event. That finding may have made some of the aforequoted language *dicta.* The concept, however, was made firm in Rethorst v. Rethorst, 214 Md. 1, 15 (1957), where the Court applied laches on the premise that "an award for temporary alimony more than a year in arrears is not permissible."

The Court next dealt with the question of laches in a support-enforcement context in *Winkel v. Winkel,* 178 Md. 489 (1940). The wife there was awarded alimony in a 1925 decree; however, because of her default in complying with another part of the decree, the alimony did not begin to accrue until 1931. The husband never made any payments under the decree. In 1933, the wife petitioned for an increase, which touched off a round of proceedings that dragged on for five years. In 1937, she filed another petition for increase. Finally, in 1939, among other things, she asked for a determination of arrearages under the 1925 decree (accounting from 1931). The lower court established the arrearage from 1931 to 1937 and reduced the alimony after 1937.

Citing *Marshall v. Marshall, supra,* and *Kalben v. King, supra,* the Court determined that any installments of alimony coming due within 12 years would not be barred by limitations. It said, at page 506-507:

> "In such event, the enforcement of the collection of the moneys due might continue or be by way of *scire facias,* attachment, execution or by other equitable remedies if within the period of limitations, *but it seems to the court that, after the expiration of one year from the time the payment of any instalment of permanent alimony fell due and remained unpaid, there should be a bar to a proceedings for contempt against the contemnor in respect of any such default in payment.* In the opinion written for the court by Judge Sloan in *Kalben v. King, supra,* there is a somewhat similar suggestion, and its adoption, as here stated, is supported by practical considerations in the administration of justice and by the fact that alimony is founded in the necessity, and the design, for current maintenance and support of the wife and children. The practice in England affords a basis for adoption. As here stated and limited the rule *is subject, however, to exceptions created by special circumstances, as absence of the husband from the jurisdiction or some other particular reasons shown."* (Emphasis supplied.)

*Winkel,* of course, dealt with alimony, not child support, although some of the rationale used to justify the special application of laches or court-fashioned limitations [11] — an application that bars not the claim, or the right generally to enforce it, but only one particular method of enforcement — would seem to apply to child support as well. Child support also is "founded in the necessity . . . for current maintenance and support. . . ."

The Court of Appeals has not directly addressed the issue, either as to alimony or child support, since *Winkel,* although in *McCabe v. McCabe, supra,* 210 Md. 308, it seems that the Court acted in total derogation of what it expressed in *Winkel.* It is apparent from the *McCabe* Opinion that Mrs. McCabe was seeking to invoke the full panoply of equity powers, including punishment for contempt, to collect an arrearage composed of both spousal and child support due for far more than a year; and, as noted earlier, the Court, without mentioning *Winkel,* said that she was entitled to such relief.[12]

*Winkel* was based in part upon *Kalben,* which in turn was premised upon ecclesiastical rules that applied peculiarly to alimony. At the time, of course (1940), *Winkel* would have been wholly inapplicable to the enforcement of child support orders, since contempt proceedings were not then available to enforce them. In light of *McCabe,* therefore, it is reasonable to consider the rule announced in *Winkel* — that contempt proceedings may not be used to enforce a support arrearage more than a year past due — at the very least, as not applying to child support orders.

Quite apart from *McCabe,* there are sound policy reasons for not extending the rather rigid and seemingly automatic termination of the contempt power. Extension would be wholly inconsistent with the legislative policy expressed in and flowing from art. 16, § 66J, *supra.* Moreover, it could, and often would, serve to penalize the child for the inaction of his

---

11. It is not clear whether the Court was creating, by judicial fiat, a new "statute" of limitations, or applying a specialized form of laches. It would seem to be more the former, since its application was automatic and did not require a finding of prejudice.

12. *Compare* Bradford v. Futrell, *supra,* 225 Md. 512, 525, and Eckard v. Gardner, *supra,* 255 Md. 171.

parent. If applicable in child support cases, the *Winkel* doctrine would bar contempt proceedings even while the child is still dependent; the child may find himself without an effective remedy for reasons entirely beyond his control. That, indeed, is the critical distinction: it is one thing to penalize a person for sitting too long on his own rights; it is quite another to penalize him because someone else sat on those rights.

The better approach, it seems to us, is to look at laches and the contempt remedy in a more flexible way. Recalling that laches involves both the lapse of time *and the consequential existence of prejudice,* and remembering further that contempt is not a mandatory remedy, but a discretionary one, the equity courts should not be bound by rigid rules in applying either the defense or the remedy. Rather, what the court must do, assuming that the right itself is not barred, is to determine in each case whether the circumstances warrant the invocation of the court's ultimate power.

Upon this basis, we have no difficulty in upholding the court's threatened use of contempt in this case. There was sufficient evidence to establish that appellant has been deliberately and systematically evading his lawful responsibilities, that the possible sanction of contempt may be the only way of enforcing his obligation, and that he is well able to comply with the extremely generous (to him) payment schedule fashioned by the court. Contempt proceedings are *not* barred by laches or by the rule announced in *Winkel.*

(3) *Other Issues*

Appellant raises five other issues in this appeal which have no merit and may be answered summarily.

(i) He claims that the evidence was insufficient to support the determination of net arrearage of $8,482.74, but we conclude that the evidence was sufficient. The court interpreted the 1971 decree as requiring child support of $450 a year for each of the two children, which, in light of the 1970 Criminal Court order, was entirely reasonable. Upon that premise, the master, and the court, started with the amount of arrearage calculated by the probation department as of the

date of the decree ($6,656.64), added the amounts coming due (and remaining unpaid) since then until the children were respectively emancipated, and applied the $450 credit as to Herman. That left the net arrearage of $8,482.74.

(ii). Appellant complains that Supreme Bench Rule 571 D was violated when the court re-referred the matter to the master after he had requested a court hearing. Appellant failed to present this complaint in his exceptions to the master's report, however, or otherwise at the hearing in court thereon, and we shall therefore not consider it in this appeal. Maryland Rule 1085.

(iii) He argues that, because the 1971 decree did not break down the $1,150 annual support into spousal and child support, it was not certain and definite in its terms; and therefore he cannot be held in contempt for violating it. The decree very clearly told appellant he was to pay $1,150. He failed to do so. He failed to pay even a part of the $1,150. Appellant had ample notice of what his obligation was.

(iv) Appellant complains next about the determination that the Department of Social Services was entitled to $7,729.64 of the amount found due. His complaint is that the action was commenced after the children were of age, and that the Department was not a party to the action. We have already answered the first point. The answer to the second is that the Department is but a subrogee or assignee of appellee's rights. It need not be a party to the action. Appellant's obligation is to appellee, who was, of course, a party.

(v) Finally, appellant complains that he was not granted a postponement in the hearing on *his* exceptions to the master's report. The exceptions were filed on August 30, *1977,* and were heard on December 20, *1978.* We find no abuse of discretion in declining appellant's invitation for further delay.

*Order affirmed; appellant to pay the costs.*