935 A.2d 432

**Brian ARRINGTON**

**v.**

**DEPARTMENT OF HUMAN RESOURCES, et al.**

**Marcellas McLong**

**v.**

**Sharon Oliver.**

**Nos. 10, 26, Sept. Term, 2007.**

Court of Appeals of Maryland.

Nov. 8, 2007.

Bell, C.J., joined in judgment only.

80

Julia Doyle Bernhardt, Asst. Public Defender (Nancy S. Forster, Public Defender, on brief), Baltimore, for appellant.

Joseph B. Spillman, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, on brief), for appellees in No. 10, Sept. Term, 2007.

Daniel P. Doty (Schulman & Kaufman, LLC, on brief), Baltimore, for appellee, in No. 26, Sept. Term, 2007.

Argued before BELL, C.J., RAKER, HARRELL, BATTAGLIA, GREENE, ALAN M. WILNER (Retired, Specially Assigned), DALE R. CATHELL (Retired, Specially Assigned), JJ.

ALAN M. WILNER, Judge, Retired, Specially Assigned.

We have before us two more cases in which a trial court has searched for some effective way to enforce the legal obligation that parents have to support the children they bring into the world.[1] In *Bryant v. Howard County Dept. of Social Services ex rel. Costley,* 387 Md. 30, 33, 874 A.2d 457, 458 (2005), we acknowledged the difficulties and the frustration faced by the courts when dealing with parents who wilfully and defiantly refuse to comply with lawful, and often consensual, child support orders.

We recognized in *Bryant,* as we had in earlier cases, that, when all other efforts fail, the last coercive arrow in the court's quiver is to hold the parent in contempt of court for wilful disobedience of the support order, but we again cautioned that, when exercise of the contempt power leads to the prospect of incarcerating the parent, the court's authority and discretion are subject to certain overarching limitations. We observed that, in an attempt to navigate through those limitations and provide a mechanism to achieve the desired result, the Court, in 1997, made certain revisions to its newly adopted Maryland Rule 15–207. The mechanism created by those revisions may not be perfect, and in some cases may not be effective, but, when employed correctly, it is at least permissi-

---

1. The cases were not consolidated, but they were argued the same day and present the same legal issue, so we have chosen to deal with them both in this one Opinion.

ble and has a reasonable chance of success. The problem in *Bryant,* as well as in *Rawlings v. Rawlings,* 362 Md. 535, 766 A.2d 98 (2001), and *Wilson v. Holliday,* 364 Md. 589, 774 A.2d 1123 (2001), and *Dorsey and Craft v. State,* 356 Md. 324, 739 A.2d 41 (1999) was that the Circuit Court did not follow the path laid out by the Rule. That is also the problem here. It is, as the great philosopher, Lawrence Peter Berra, is reputed to have said, *deja vu* all over again.

## BACKGROUND

### Brian Arrington

Brian Arrington sired three children within an eighteen month period but has steadfastly refused to support any of them. In February, 1992, through a consent paternity judgment entered by the Circuit Court for Baltimore City, he was ordered to pay $25 per week to Audra Hardy for the support of their minor child, Sonata, born in October, 1991. In August, 1992, through a second consent paternity order entered by the Circuit Court, he was ordered to pay Kimberly Valentine $45 per week for the support of their minor child, Martia, born in January, 1992. Finally in October, 1993, through a third consent paternity order entered by the Circuit Court, he was ordered to pay Ms. Hardy $28 per week for the support of their minor child, Rian, born in March, 1993.

By late 1998, Arrington had accumulated an arrearage of nearly $14,800 with respect to Sonata and Rian and over $14,000 with respect to Martia, and contempt charges were filed. It appears that he was incarcerated, at least for a time, when he failed to appear as directed. There is some indication that in September, 1999, he was found in contempt in all three cases but was released from confinement upon his agreement to pay certain lump sums by January 3, 2000. Whether those sums were paid is not clear. In October, 2001, the three support orders were modified with respect to amounts and payments on the arrearages.[2]

---

2. The records in the three Arrington cases are hopelessly confusing with respect to what occurred between 1992 and 2004. There are

The cases now before us commenced in January, 2004, apparently upon the issuance of two Paternity Contempt Warrants, one with respect to Sonata and Rian (the *Hardy* case) and the other with respect to Martia (the *Valentine* case). Both warrants state that they were based on verified petitions, but the only petitions that we can locate in the record were those filed in December, 1998, which, of course, were five years old at the time and appear to have been adjudicated in September, 1999. The warrants directed that Arrington be apprehended and committed to the Baltimore City Jail pending a hearing but authorized bail of $5,000. For whatever reason, it took eighteen months—until July 26, 2005—for those warrants to be served. Upon his arrest, Arrington was incarcerated pursuant to the warrants until mid-September. At some point, a hearing on the contempt petitions was scheduled for October 4, 2005.

At that hearing, it appears that an agreement was reached between the State and Arrington, who was represented by counsel, that the case would proceed through an agreed statement of facts. After questioning Arrington, the court found that his consent to that approach was knowing, intelligent, and voluntary. The agreed statement, recited by the prosecutor, established that the current arrearage with respect to Sonata was $14,933, the arrearage as to Rian was $16,421, and the arrearage with respect to Martia was $27,390. It was agreed as well that Arrington had never claimed any mental or physical disability that would have prevented him from complying with the support orders, that he was employed in the first quarter of 2005 but earned only $166, that he was employed in the second quarter of that year but earned only $1,361, and that he had been employed in 2003 and 2004 but earned only a pittance.

---

references to contempt findings in September, 1999, Incarceration Show Cause Orders issued in October, 2001, a warrant issued in December, 2001, releases from confinement, and proceedings of one kind or another, but it is impossible to discern any clear trail of what actually happened.

On that record, the court found the arrearages as agreed. It also found that Arrington had the ability to work, that he did in fact work during the relevant period, that he suffered from no apparent physical or mental disability, that he wilfully failed to comply with the court order, and that he was therefore in civil contempt. Arrington, who had been released from jail only two weeks earlier, informed the court that he was currently employed, that he made $8 an hour, and that he was living with his sister. In accordance with the understanding between the parties, the court continued the matter until January 12, 2006, but directed that Arrington pay a lump sum of $750 ($250 per child) on the arrearage and that he continue to pay current support. Arrington agreed to that condition.

The hearing scheduled for January 12 was postponed, for reasons not appearing in the record. It was rescheduled for April 26, 2006, but was again postponed when Arrington failed to appear. A warrant was issued for his arrest, and he was again ordered committed to the Baltimore City Detention Center, subject to bail of $10,000. The warrant was served in July, at which point, following a bail hearing, his aggregate bail, on all three cases, was reduced to $2,000, pending a rescheduled hearing on October 3, 2006.[3]

The October 3 hearing began on a note of frustration. Ms. Valentine, Martia's mother, complained that it was the ninth time she had to appear in court in an effort to enforce the support order. She reminded the court that Arrington had been ordered to make a lump sum payment on January 12, and that he had failed to do so, and that all she had received were three checks for $48 in April. She complained that "he would just work a job for just a couple of weeks and then stop." When the court expressed its own uncertainty as to

---

3. It was revealed at the hearing on October 3 that Arrington had been incarcerated in July, 2006, for violation of probation that arose from an unlawful use conviction but that the incarceration for that offense ended on September 5, when his probation terminated. He remained in jail under the warrants because he failed to post the $2,000 bail. It was also revealed that on August 24, 2006, he was convicted of possession of drug paraphernalia and fined.

what to do, the prosecutor suggested, based on what another judge had been doing, that Arrington, who had already been found in contempt, be incarcerated but immediately put on work release—that the purge be the work release through which he could make the required payments—and that this be done through an entity known as Dismas House.[4] The prosecutor advised the court that, if Arrington were committed to the Baltimore City Detention Center, someone from Dismas House would come to the jail to interview him to see if he qualified as a candidate for the Dismas House program. In the end, the court continued the case so that Arrington, who remained incarcerated in default of the $2,000 bail, could be interviewed.

The proceeding resumed on October 25, before a different judge. The arrearages as of then were nearly $34,000 with respect to Sonata and Rian and $29,500 with respect to Martia. Aside from that, the only new information was that Arrington had been found by the Detention Center to be an acceptable candidate for work release, although it was not clear at the time whether he had been accepted into Dismas House. Defense counsel objected to any incarceration absent a finding of present ability to meet whatever purge was set by the court. Unimpressed, the court committed Arrington to the Division of Correction for a period of eighteen months, subject to the following purge: "Defendant to enter Dismas House and secure full-time employment with earnings with-

---

4. Dismas House appears to be a national movement, named for St. Dismas, the penitent thief who was crucified with Christ. In many communities throughout the country, including Baltimore City, churches or other non-profit organizations have established Dismas House group homes for prisoners, to provide a transition back into community life. In Baltimore City, Dismas House of Baltimore, Inc., a private non-profit agency, maintains two Community Adult Rehabilitation Centers, each with 45 beds, under a contractual arrangement with the State Division of Correction. The centers accept prisoners with sentences of three years or less or who are within six months of release. They provide a variety of counseling and support services, including work release, but, as Community Adult Rehabilitation Centers, they are not just group homes but correctional facilities. See Maryland Code, §§ 11–301 through 11–320 of the Correctional Services Article.

holdings for purge (work release program)." The Commitment Record shows a sentence of eighteen months for civil contempt "to be served at Baltimore City Work Release Program."

From that order, Arrington appealed. We are advised that, on November 16, 2006, the court entered additional orders in each case committing Arrington to Dismas House and that separate appeals were taken from those orders. On Arrington's motion, the Court of Special Appeals, on January 31, 2007, stayed the Circuit Court commitment orders and directed that Arrington be released pending the appellate proceeding. Coincidentally, on the same day, the Circuit Court, advised that Arrington had been accepted into Dismas House on October 25, 2006, and that he had obtained full-time employment, entered an order finding that he had purged his contempt and ordering his release from Dismas House. In April, 2007, we granted *certiorari* prior to any other significant proceedings in the Court of Special Appeals.

### *Marcellas McLong*

In September, 1994, through a consent paternity judgment entered by the Circuit Court for Baltimore City, McLong was ordered to pay $25 per week to Sharon Oliver for the support of their minor child, Solena, born in January, 1993. In April, 2003, a petition for contempt was filed, alleging an arrearage of over $7,500. Following a hearing in September, the court found the arrearage to be nearly $8,000, ordered that McLong be adjudged in contempt unless he purged himself of the contempt by making regular support payments of $25 per week and paying an additional $25 per week on the arrearage, and directed that an earnings lien be established.

In May, 2005, the Child Support Enforcement Office, alleging an arrearage of over $10,000, requested an order directing McLong to show cause why he should not be held in contempt. A hearing was scheduled before a Master for July 11, 2005, but McLong failed to appear. A hearing was then scheduled before a judge on July 20, following which the court entered an order establishing an arrearage of $10,470 and directing

that McLong be adjudged in contempt unless he purged by making the current and arrearage payments called for in the September, 2003 order, though on a monthly, rather than a weekly, basis. That did not seem to work, and in April, 2006, another petition for contempt was filed. A hearing scheduled for July 12, 2006, was postponed until October 5, with the direction that McLong bring with him at that time evidence verifying income from all sources, that he verify that he had made five attempts each week to look for a job, and that he "enroll in and complete GED program, and bring documentation." [5]

At the October 5 hearing, McLong informed the court that he had a job in which he earned $8 an hour, working about 30 hours a week. He had been working for about two weeks, but had made no support payments. He said that he expected to start a GED program in about two weeks. Because McLong appeared without counsel, the court explained that he had a right to a full trial or he could admit that he was in arrears, and he chose the latter.[6] A child support enforcement official then advised, without contradiction, that, pursuant to the September, 2003 order, McLong should have paid $8,233 in current support and reduction of the arrearage, that he had paid nothing during that period, and that his total arrearage was $12,095. Upon that evidence, the court found the arrear-

---

**5.** McLong had advised the court that he had gone to the 12th grade in school but had not graduated and that he was working on his GED. GED is sometimes used as the acronym for General Education Development and sometimes for General Equivalence Diploma or General Educational Diploma. It involves a battery of five tests developed by the American Council on Education, in language arts (writing), social studies, science, language arts (reading), and mathematics, given at official GED testing centers throughout the country to applicants who have not received a high school diploma. Upon satisfactory completion, the applicant receives a certificate of general educational development.

**6.** McLong had been advised in July of his right to counsel and the need to contact the Public Defender's Office if he desired appointed counsel. He acknowledged that he had not contacted the Public Defender—that he "just didn't go over there." The court found that he had waived counsel, a finding not challenged in this appeal.

age to be $12,095, found as well that McLong was in civil contempt, and postponed disposition until February 1, 2007. Both orally and in the form of an Order, the court instructed McLong that, upon his return to court, he was to verify his income from every source, make a lump sum payment of $500, and either complete a GED or provide proof of his GED status.

When the proceeding resumed on February 1, the court was informed that McLong had not made any of the payments the court directed in October. The court thereupon sentenced McLong to incarceration for two years, which could be purged through the payment of $2,000 in cash. No inquiry was made, and no finding was made, as to whether McLong could pay that amount, or any other amount. The court treated the sanction as a criminal sentence and advised McLong that he had ten days to ask for "a new trial," 90 days to request a "modification of the sentence," and 30 days to file an appeal. The court reset the matter for review in May, 2007.

McLong noted an appeal. While the appeal was pending in the Court of Special Appeals, McLong sought a stay of the February 1 order, first from the appellate court and, when that was denied, from the Circuit Court. On May 15, 2007, the Circuit Court denied the stay but, through a new commitment order, amended the purge to payment of $200 and presentation of a GED certificate. A month later, we granted *certiorari* prior to any significant proceedings in the Court of Special Appeals. In July, the Circuit Court stayed the May 15 amended commitment order pending completion of the appellate process and ordered the immediate release of McLong from incarceration. In a companion order entered the same day, the court established the current arrearage at $13,070, scheduled a review hearing for November 21, 2007, and, as before, ordered McLong to "enroll in and complete (if possible) a GED class."

## THE ISSUES

The issues raised by Arrington and McLong are factually distinct but legally similar. Did the court cross the line by

imposing sanctions in a civil contempt case that, whatever their intent, are more punitive than coercive? Can a court, in a civil contempt case, impose incarceration as a sanction for the contempt, subject to purge conditions that the contemnor cannot meet in time to avoid the incarceration?

The specific argument made by Arrington is that the court erred in (1) continuing his incarceration subject to a cash bail of $2,000, which it knew he could not meet, and (2) imposing incarceration as a sanction for the contempt until he obtains employment and begins making support payments, knowing that he could not meet those conditions prior to commencing the incarceration. McLong complains that the court erred in (1) imposing a sentence of two years imprisonment with a purge provision of $2,000, which the court knew he could not meet, and (2) conditioning release from incarceration on the obtention of a GED certificate, knowing that he could not obtain that certificate prior to commencing the incarceration.

## DISCUSSION

### Mootness as to Arrington

■ Arrington has not challenged the finding of contempt, which was entered in October, 2005, and from which no appeal was taken. His appeals are from the orders entered in October and November, 2006, and go only to the purge and the sanction—his incarceration in default of purge conditions that he could not meet in time to avoid the incarceration. The State contends that, because, during the pendency of the appeal, the Circuit Court declared his contempt purged and ordered his release from confinement, the appeal has become moot and should be dismissed as such.[7]

---

7. No such contention has been, or legitimately could be, made with respect to McLong's appeal. Although he, too, is appealing only from the sanction imposed and not from the finding of contempt itself, there has been no finding in his case that his contempt has been purged. He was released from confinement only because the order imposing that sanction was stayed during the pendency of the appeal. Should this

The State is correct that Arrington's appeal has become moot. The only status of which he complains no longer exists. As noted, he does not challenge the finding of contempt; nor does he complain about the requirement that he obtain employment to which an earnings lien may be attached. His attack is directed solely to the order that he be incarcerated until such time as he obtains that employment or posts $2,000 bail, but that order has been vacated and, in light of the court's finding that the contempt for which that sanction was imposed has been purged, it may not be reinstated.

Arrington's situation is quite different from those in which we have entertained appeals from contempt findings in the absence of a sanction. In *Bryant v. Social Services, supra,* 387 Md. 30, 874 A.2d 457, the appellant, charged with contempt for failure to pay child support, was, in effect, placed on a criminal probation and ordered, among other things, to submit to periodic drug testing and to attend Narcotics Anonymous or other self-help meetings. When he failed to comply with those requirements, the court found him in civil contempt, and, although no imprisonment or other sanction was imposed, those two requirements remained in effect. He appealed from that contempt order, complaining that those requirements, addressed to his drug addiction, were impermissible conditions to the enforcement of a child support order and that the court had no authority to base a contempt finding on a violation of those conditions. His challenge was to the contempt finding itself.

Noting that Bryant had never been incarcerated or otherwise sanctioned for violating the two conditions and that the probation order that imposed those conditions had expired, the State moved to dismiss the appeal as moot. We denied the motion. We pointed out that Maryland Code, § 12–304(a) of the Cts. & Jud. Proc. Article expressly permits a person to appeal "from any order or judgment passed to preserve the power or vindicate the dignity of the court and adjudging him

---

Court affirm that order, he would be subject to immediate reincarceration.

in contempt of court" and that the statute did not require, as a condition to the appeal, that the adjudication of contempt be accompanied by a sanction. We observed as well that "[a] finding of contempt, even without the immediate imposition of punishment or sanction, leaves the defendant adjudged to have wilfully violated a court order and may well leave the defendant subject to future punishment at the will of the court." *Id.* at 45, 874 A.2d at 465.

As we have indicated, that is not the case here. Arrington complains only about the validity of the incarceration, which no longer exists and which cannot, in light of the court's finding that the contempt has been purged, be reinstituted absent a new finding of contempt. Nor can we discern any indirect or collateral consequences of the orders he has appealed that might preclude a finding of mootness. *Compare Toler v. MVA,* 373 Md. 214, 817 A.2d 229 (2003). Nonetheless, in exceptional situations, we have addressed issues in cases that are technically moot, when "[t]he urgency of establishing a rule of future conduct in matters of important public concern is imperative and manifest," or where "the matter involved is likely to recur frequently, and its recurrence will involve a relationship between government and its citizens, and upon any recurrence, the same difficulty which prevented the appeal at hand from being heard in time is likely again to prevent a decision." *Lloyd v. Supervisors of Elections,* 206 Md. 36, 43, 111 A.2d 379, 382 (1954); *Matthews v. Maryland–National Capital Park & Planning Com'n,* 368 Md. 71, 96, 792 A.2d 288, 303 (2002); *Hammen v. Baltimore County Police Dept.,* 373 Md. 440, 450, 818 A.2d 1125, 1131 (2003).

This is such a case. It appears from both the record in this case and from uncontradicted representations made at oral argument that a practice has developed in the Circuit Court for Baltimore City of committing fathers found in contempt for failure to comply with child support orders to Dismas House or the Baltimore City Detention Center until such time as they obtain employment through a work release program or satisfy other conditions they are unable to meet in time to avoid the incarceration. The validity of that practice, which

may affect hundreds of recalcitrant parents whose cases come before that court, is what is being challenged by both Arrington and McLong, and it is urgent and imperative that the issue be resolved.

### The Proper Handling of Non–Support Contempt Cases

Until January 1, 1997, the Maryland Rules dealing with contempt proceedings, found in subtitle P of Chapter 1100, were rather sparse. Although they acknowledged the existence of both civil and criminal contempt, they provided little guidance with respect to how to deal with either, but addressed only the distinction between direct and constructive contempt. The case law was somewhat more informative, but not a lot. In *State v. Roll and Scholl,* 267 Md. 714, 727, 298 A.2d 867, 875 (1973), the Court recognized that, over the years, the historical foundation of contempt had tended to erode and "out of the rubble, confused and indistinct categories have arisen." The Court added, in particular, that "the line between civil and criminal contempt is frequently hazy and indistinct" and that "[o]ften the same acts or omissions may constitute or at least embrace aspects of both." *Id.* at 728, 298 A.2d at 876. From the haze and rubble, the Court attempted to delineate with better precision the various kinds of contempt that existed and how they should be handled.

*Roll and Scholl* involved criminal contempts—the refusal of two witnesses to testify before a grand jury, even though offered immunity against prosecution for what they might say. The issue was whether the contemptuous refusal to testify was a direct contempt that could be punished summarily or a constructive contempt that required a fact-finding proceeding. In resolving that issue, the Court looked at the broader universe of contempts, noting that a contempt could be civil or criminal and that, at least theoretically, either could be direct or constructive. There was thus a grid into which contempts could fall:

| | |
|---|---|
| Direct Criminal | Constructive Criminal |
| Direct Civil | Constructive Civil |

The Court defined a direct contempt, whether criminal or civil, as occurring when the action of the contemnor "inter-

rupt[s] the order of the courtroom and interfere[s] with the conduct of business," and is "within the sensory perception of a presiding judge." *Id.* at 734, 298 A.2d at 879. In that circumstance, the judge "will have a sufficient knowledge of the contemptuous act which tends to interrupt the proceedings and will not have to rely on other evidence to establish all the details, though some of them can be supplied by additional testimony." *Id.* A constructive contempt is the reverse of that, conduct that does not interrupt the order of the court-room or interfere with the conduct of business and is not within the sensory perception of the judge. The facts demonstrating the contemptuous conduct must be proved by evidence.

Addressing the distinction between civil and criminal contempts, the Court noted that a civil contempt proceeding is intended to preserve and enforce the rights of private parties to an action and to compel obedience to orders and judgments entered primarily for their benefit. Such a proceeding, we said, is remedial, rather than punitive, in nature, intended to coerce future compliance, and, accordingly, "a penalty in a civil contempt must provide for purging." *Id.* at 728, 298 A.2d at 876. Conversely, the penalty in a criminal contempt proceeding is to punish for past misconduct, which may no longer be capable of remedy. That kind of penalty is thus punitive in nature and does not require a purging provision, but it must be determinate. These distinctions, between direct and constructive contempts and civil and criminal contempts, articulated in *Roll and Scholl,* have been confirmed by us on numerous occasions. *See,* most recently, *King v. State,* 400 Md. 419, 929 A.2d 169 (2007).

*Roll and Scholl* stressed that a civil contempt sanction, being coercive rather than punitive in nature, had to have a purging provision. Because *Roll and Scholl* involved a criminal contempt, the Court did not have to wander further into the nuances of civil contempt The Court was surely aware from earlier cases, however, that some judges, when confronting parents or spouses who had wilfully failed to obey support orders and who, when brought to court to face civil contempt

charges, pled and proved poverty as an excuse, nonetheless ordered their immediate incarceration, subject to a lump sum cash payment purge. They did this in the belief that, before the cell door actually closed later in the day, the money would mysteriously appear, often through the beneficence of a parent, sibling, or friend. The practice was unauthorized and unlawful, even under existing case law. It was not uncommon, however, because, in many instances—though by no means all—it produced the desired result.

In *Elzey v. Elzey,* 291 Md. 369, 374, 435 A.2d 445, 448 (1981), the Court reiterated that, in a civil contempt proceeding based on the failure to comply with a support order, "imprisonment may be avoided by showing that one has neither the money nor the ability to pay," and that "the issue is not the ability to pay at the time the payments were originally ordered" but rather the *present* ability to pay. *Elzey v. Elzey, supra,* 291 Md. 369, 374, 435 A.2d 445, 448, quoting in part from *Soldano v. Soldano,* 258 Md. 145, 146, 265 A.2d 263, 264 (1970) and citing other cases to the same effect. *Elzey* thus pointedly confirmed that a person may not be incarcerated for civil contempt based on a failure to comply with a support order unless the court established a purging provision with which the person had the current ability to comply and, by so complying, avoid the incarceration, and that courts would no longer be able to ignore that requirement. Most judges got the message and began looking for other ways to coerce compliance.

In 1995, the Court's Standing Committee on Rules of Practice and Procedure (Rules Committee) filed its 132nd Report, which contained a major overhaul of the Rules dealing with special proceedings, including contempt cases (proposed Rules 15–201 through 15–208). Although the new Rules initially proposed to the Court contained somewhat greater guidance in the handling of contempt proceedings, especially constructive civil contempt proceedings, they did not focus, in particular, on proceedings to enforce support orders. While the 132nd Report was pending, the Court decided *Lynch v. Lynch,* 342 Md. 509, 677 A.2d 584 (1996). The Court there recon-

firmed that a person could not be incarcerated for civil contempt unless the court attached a purge provision with which the person had the current ability to comply, but it went further and extended the present-ability-to-comply principle not just to the sanction of incarceration but to the finding of contempt as well. The Court held that, even upon proof that the person had the ability to comply with a support order during the period of that order and wilfully failed to do so, a contempt finding was impermissible unless the person had the present ability to comply with that underlying support obligation on the day of trial.

Immediate concern was expressed by judicial, prosecutorial, and support enforcement officials that *Lynch* had changed both the structure of civil contempt proceedings and the viability of that remedy to enforce child and spousal support orders. After holding an open meeting on the 132nd Report, at which that concern was discussed, the Court, with some modifications, adopted the Rules recommended in that Report, including the proposed Rules governing contempt proceedings, but, in its June 5, 1996 Order, directed the Rules Committee to look again at the new contempt Rules in light of *Lynch* and to report any recommended changes to the Court by October 31, 1996. *See* 23:14 Md. Register, P-1 (July 5, 1996).

The Rules Committee held two public meetings on the impact of *Lynch*, on September 6 and October 4, 1996, and, from the extensive evidence presented, concluded that the concern was valid and that *Lynch* had gone too far. The problem was that obligees and support enforcement officials might well be able to establish that the defendant had the ability to comply with the support order, at least in part, during the period prior to the filing of the petition for contempt and could use that ability to establish the contempt, but rarely would they be able to document the defendant's precise financial status on the day of trial. Under *Lynch*, they complained, if the defendant came to court and simply asserted that he then—that day—had no funds, their inability to controvert that assertion would preclude a finding of contempt.

The support enforcement community understood that, upon a finding of constructive civil contempt, the court was obliged to establish a purge and that the contemnor could not be incarcerated unless he or she had the current ability to meet that purge, but, under pre-*Lynch* practice, the judge, notwithstanding the defendant's current alleged poverty, could determine the arrearage, make a finding of contempt based on the defendant's past ability to comply with the order, postpone the imposition of any sanction, and direct that the defendant take certain action prior to the next hearing—seek employment or other earning capacity to enable him or her to meet a lump sum payment purge. If the defendant wilfully failed to comply with those directives and for that reason remained unable to meet the purge, the court could find and punish a contempt based on *that* violation. The witnesses claimed that that approach was often successful and, in many instances, it was the only approach that *was* successful. One witness estimated that between 50% and 75% of those individuals found in contempt and faced with potential incarceration did purge. *See* Minutes of Rules Committee meetings on September 6, 1996 and October 4, 1996, and exhibits thereto.

In obedience to the Court's directive and upon this evidence, the Rules Committee reported those findings to the Court and recommended that certain changes be made to the newly adopted contempt Rules. *See* letter of October 31, 1996, from Rules Committee Chair to the Court, quoted in *Rawlings v. Rawlings, supra,* 362 Md. 535, 549–50, 766 A.2d 98 and *Wilson v. Holliday, supra,* 364 Md. 589, 600–01, n. 5, 774 A.2d 1123, 1129–30, n. 5. The principal change recommended was a new section (e) to Rule 15–207, to deal specifically with constructive civil contempt to enforce support orders. The Rules Committee's proposal, which, over a dissent, was adopted by the Court (*see* 24:2 Md. Register 97, Jan. 17, 1997), was intended to overrule the holding in *Lynch* that precluded a finding of contempt absent a current ability of the defendant to meet a purge and, building on the other new contempt Rules and by bringing appropriately into play both civil and criminal contempt proceedings, permit the existing regime, as

explained to the Rules Committee but with some modifications, to continue.

Rule 15–207(e) applies only to constructive civil contempt proceedings based on the alleged failure to pay child or spousal support. *See* Rule 15–207(e)(1). Rule 15–207(e)(2) permits a court to make a finding of contempt "if the petitioner proves by clear and convincing evidence that the alleged contemnor has not paid the amount owed, accounting from the effective date of the support order through the date of the contempt hearing." Subsection (e)(3) of the Rule provides two defenses to such a finding: if the defendant proves by a preponderance of the evidence that (A) from the date of the support order through the date of the contempt hearing, he or she "(i) never had the ability to pay more than the amount actually paid and (ii) made reasonable efforts to become or remain employed or otherwise lawfully obtain the funds necessary to make payment" or (B) enforcement by contempt is barred by limitations.

Present inability to comply with the support order or to meet a purge established by the court is *not* a defense and does *not* preclude a finding of contempt under subsection (e)(2). That is the part of the Rule that overrules the inconsistent holding in *Lynch. See Rawlings v. Rawlings, supra,* 362 Md. 535, 549–53, 766 A.2d 98, 106–08. If the petitioner proves that the defendant failed to pay the amount owed and the defendant fails to prove either that he or she could not have paid more than was paid or that limitations has run on the part that could have been paid, the court may find the defendant in contempt.

Subsection (e)(4) of the Rule and the Committee Note that follows the Rule provide a roadmap for how the contempt finding may be implemented. Subsection (e)(4) provides that, upon a finding of constructive civil contempt for failure to pay support, the court must enter a written order that specifies (A) the amount of arrearage for which enforcement by contempt is not barred by limitations, (B) the sanction imposed

for the contempt, and (C) how the contempt may be purged. That section further provides:

"If the contemnor does not have the present ability to purge the contempt, the order may include directions that the contemnor make specified payments on the arrearage at future times and perform specified acts to enable the contemnor to comply with the direction to make payments."

The Committee Note to the Rule explains that § (e) modifies *Lynch* by allowing a court to make a finding of contempt in a support enforcement action even if the defendant does not have the present ability to purge and that, as in other civil contempt cases, "after making a finding of contempt, the court may specify imprisonment as the sanction *if the contemnor has the present ability to purge the contempt.*" (Emphasis added). The Committee Note goes on to provide:

"If the contemnor does not have the present ability to purge the contempt, an example of a direction to perform specified acts that a court may include in an order under subsection (e)(4) is a provision that an unemployed, able-bodied contemnor look for work and periodically provide evidence of the efforts made. *If the contemnor fails, without just cause, to comply with any provision of the order, a criminal contempt proceeding may be brought based on a violation of that provision.*"

(Emphasis added).

As a recapitulation, the regime and procedure for enforcing support orders through constructive contempt proceedings, established by Rules 15–201 through 15–208 and prevailing case law, are as follows:

(1) If the *State* wishes to punish a person for wilfully failing to comply with a valid support order, it may institute constructive *criminal* contempt proceedings pursuant to Rule 15–205. *See Ashford v. State*, 358 Md. 552, 750 A.2d 35 (2000); *Dorsey and Craft v. State, supra,* 356 Md. 324, 739 A.2d 41.[8] Such a

---

8. Wilful non-support of a minor child is also a direct criminal offense, carrying a penalty of up to three years in prison and a $100 fine. *See*

proceeding may be brought only by a State's Attorney, the Attorney General, the State Prosecutor, or the court—not by a party to the domestic case—and, if the court institutes the proceeding, it may, and should, appoint one of those prosecutorial officials to file the petition and prosecute the charge. *See* Rule 15–205(b) and (c). A criminal contempt action must be docketed as a separate criminal action. It is not part of the action in which the support order was issued; it may not be combined, in a single charging document, with a civil contempt action; and a civil contempt action may not be converted, midstream, into a criminal contempt action. *See Dorsey and Craft v. State, supra,* 356 Md. 324, 739 A.2d 41.

If a criminal contempt action is filed, the defendant is entitled to most of the procedural rights attendant to criminal cases. *See Dorsey and Craft* at 342–43, 739 A.2d at 51; *Mitchell v. State,* 320 Md. 756, 761, 580 A.2d 196, 199 (1990); *Roll and Scholl, supra,* 267 Md. at 731, 298 A.2d at 877.[9] Rule 15–205(e) and (f) make clear that, among those rights are the right to counsel, which may be waived only upon compliance with Maryland Rule 4–215, and to a jury trial, which may be waived only upon compliance with Maryland Rule 4–246, and included as well are the privilege against self-incrimination, the opportunity to be heard and present evidence, and the right to confront witnesses. In such an action, the State bears the burden of proving the contempt beyond a reasonable doubt. *Ashford v. State,* 358 Md. 552, 750 A.2d 35 (2000). What the State must prove is "a deliberate effort or a wilful act of commission or omission by the alleged contemnor committed with the knowledge that it would frustrate the order of the court." *In re Ann M.,* 309 Md. 564, 569, 525 A.2d 1054, 1056 (1987); *Dorsey and Craft v. State, supra,* 356 Md.

---

Maryland Code, Family Law Article, § 10–203. *See* also §§ 10–204 through 10–216, which provide an alternative enforcement mechanism.

**9.** We say "most" because there may be some that do not apply to a contempt proceeding. The proceeding is commenced, for example, by an order and petition, rather than by indictment or criminal information, and there is no right to a preliminary hearing.

at 352, 739 A.2d at 56. As we pointed out in *Dorsey and Craft*, "evidence of an ability to comply, or evidence of a defendant's conduct purposely rendering himself unable to comply, may, depending on the circumstances, give rise to a legitimate inference that the defendant acted with the requisite willfulness and knowledge." *Id.* at 352, 739 A.2d at 56. If the sanction for a constructive criminal contempt is incarceration, the court's order must "specify a determinate term and any condition under which the sanction may be suspended, modified, revoked, or terminated." Rule 15–207(d)(2). The sentence is largely within the discretion of the court, so long as it is not cruel or unusual. *See Archer v. State, supra,* 383 Md. 329, 345, 859 A.2d 210, 220.[10]

(2) The obligee under the support order or a person or agency authorized to act on his or her behalf may file, in the action that produced the support order, a petition for constructive *civil* contempt pursuant to Maryland Rule 15–206. If incarceration to compel compliance with the support order is sought, the petition must so state, and the defendant is entitled to counsel and must be notified of that right. Any waiver of counsel on the defendant's part must be knowing and voluntary. *See* Rule 15–206(c) and (e); also *Zetty v. Piatt,* 365 Md. 141, 776 A.2d 631 (2001). The standards for a constructive civil contempt proceeding are set forth in Rule 15–207, most of which we have already discussed.

If the proceeding is one for constructive civil contempt, the petitioner must prove by clear and convincing evidence that the defendant failed to comply with a valid support order; *i.e.,* that "a prior court order directed [the defendant] to pay the support ... and the [defendant] failed to make the court-ordered payments." *Jones v. State,* 351 Md. 264, 273, 718 A.2d 222, 227 (1998). Upon such proof, the court may find the defendant in contempt unless the defendant proves, by a

---

**10.** We express no opinion here whether a prison sentence for criminal contempt based solely on failure to obey a support order may exceed the three year maximum allowed by Family Law Art., § 10–203 for criminal non-support.

preponderance of the evidence, that, despite making reasonable efforts, he or she never had the ability to pay more than was paid or that enforcement of the obligation with respect to the unpaid amounts through contempt is barred by the three-year statute of limitations set forth in Maryland Code, § 10–102 of the Family Law Article.

If, or to the extent that, the defendant fails to establish one of those defenses and the court finds the defendant in contempt, the court must then address the question of sanction. Rule 15–207(e)(4) requires the court to enter a written order that specifies the amount of arrearage not barred by limitations, any sanction imposed for the contempt, and how the contempt may be purged. In that regard, it is critical to keep in mind, as a most fundamental principle, that *it is impermissible in a civil contempt action "to apply sanctions that are available only in a criminal contempt case." Bryant v. Social Services, supra,* 387 Md. at 50, 874 A.2d at 468 (Emphasis added).

Although the text of the Rule does not explicitly bar incarceration if the defendant is then unable to meet the purge, case law, confirmed by the Committee Note attached to the Rule, clearly does, and the Rule must be read in light of that case law and Committee Note. If the court anticipates the prospect of incarceration, therefore, it must determine whether the defendant has the current ability to meet the purge. In most instances, that will depend on what the purge is. If, as in the great majority of cases, it is the payment of a sum of money, the question will be whether the defendant is then, *on that day,* able to make that payment. The court may not order an incarceration to commence in the future, because the finding of ability to purge must be contemporaneous with when the incarceration is to commence and must remain in existence throughout the period of incarceration. The defendant must have the ability to avoid both the commencement and the continuation of incarceration. *Jones v. State, supra,* 351 Md. at 282, 718 A.2d at 231.

The Rule does not specify who has the burden of proof on that issue. Case law, however, establishes that the burden is on the contemnor to establish his or her inability to meet the purge. *See Lynch v. Lynch, supra,* 342 Md. 509, 513, n. 1, 677 A.2d 584, 586, n. 1; *Soldano v. Soldano,* 258 Md. 145, 146, 265 A.2d 263, 264 (1970). That approach is consistent with the "rule grounded in common sense that the burden of proving a fact is on the party who presumably has peculiar means of knowledge" enabling him or her to establish the fact. *Lake v. Callis,* 202 Md. 581, 587, 97 A.2d 316, 319 (1953); *Garrett v. State,* 124 Md.App. 23, 29, 720 A.2d 1193, 1195 (1998); *National Communications Ass'n, Inc. v. AT & T Corp.,* 238 F.3d 124 (2nd Cir.2001); *International Harvester Co. v. Ruckelshaus,* 478 F.2d 615 (D.C.Cir.1973) (when certain material lies particularly within the knowledge of a party, that party is ordinarily assigned the burden of adducing the pertinent information; this assignment of burden is appropriate when the other party is confronted with the formidable task of establishing the negative). It is the defendant who best knows his or her immediate financial situation and has the best access to evidence establishing that status. Indeed, it was the inability of the petitioner to know the defendant's financial situation on the day of trial that led the Court to add § (e) to Rule 15–207. That is why, if the purge calls for the payment of money, the defendant must be given "the opportunity to show that he or she is unable, rather than unwilling, at that time, to make the court-ordered payments." *Jones v. State, supra,* 351 Md. at 281, 718 A.2d at 231. *See also Johnson v. Johnson,* 241 Md. 416, 420, 216 A.2d 914, 917 (1966).

Obviously, the court is not required to believe everything (or anything) any witness says, especially when it is unsupported by other evidence, but the court may not ignore credible and uncontroverted evidence of a defendant's impecunious circumstances in order to circumvent the limitation on incarceration. A defendant claiming poverty may be questioned regarding that claim, and other evidence, together with reasonable inferences from other evidence, may be considered, both for its own value and as affecting the defendant's credibility.

A purge does not necessarily have to be a sum of money, of course, but (i) as we indicated in *Bryant v. Social Services, supra,* 387 Md. at 50, 874 A.2d at 468, in order that it not be regarded as impermissibly arbitrary or punitive, rather than coercive, it must have some reasonable connection to enforcement of the support order, and (ii) if incarceration is anticipated if the purge is not met, the purge must still be one which the defendant can immediately meet in order to avoid the incarceration.

(3) Although constructive civil and criminal contempts may not be charged in a single petition and a civil contempt proceeding may not be converted into or merged with a criminal contempt proceeding, criminal and civil constructive contempt proceedings may occur sequentially or contemporaneously. In *Roll and Scholl,* the Court observed that, in a constructive civil contempt proceeding, the evidence may "indicate that the alleged contemnor cannot comply with the order of the court that directed him to perform an act for the benefit and advantage of another party to the suit," and it declared that, "[i]f this inability to comply was caused by a deliberate effort or a wilful act of commission or omission by the alleged contemnor committed with the knowledge that it would frustrate the order of the court, the civil contempt proceeding *should* be terminated and new proceedings may be instituted which can result in a finding of criminal contempt." *Id.* 267 Md. at 730, 298 A.2d at 877 (Emphasis added). In light of the new contempt Rules adopted after *Roll and Scholl,* and the options they provide, we would amend "should" to "may." The approach, of terminating the civil contempt proceeding and commencing a criminal proceeding, to *punish* for the past contemptuous conduct, remains viable, however.[11]

Rule 15–207(a) permits a person to be charged separately with both a constructive civil and constructive criminal con-

---

**11.** The *Roll and Scholl* Court did not indicate at what point the civil contempt proceeding should or could be terminated. In light of the procedure set forth in Rule 15–207(e), it would appear that, absent a stipulation, the appropriate time would be after the petitioner has

tempt and for the two proceedings to be consolidated for purposes of hearing and disposition. In that way, civil and criminal constructive contempt proceedings may coexist contemporaneously. Courts should be exceedingly cautious in using that approach, however. Civil and criminal contempts have a different focus, and each permits things forbidden to the other. When they are consolidated for hearing and disposition, there is a real danger of crossing the line and applying principles and procedures applicable to only one kind of action to the other.

■ (4) Courts may be creative in constructive civil contempt cases in fashioning reasonable purges and enforcing non-compliance with them, but their creativity may not extend to devices of any kind that effectively circumvent the bedrock, unambiguous bar against setting a purge that the defendant is currently unable to meet and then incarcerating the defendant for failing to meet that purge. That includes continuing an incarceration under a bench warrant or body attachment that was issued solely to bring the defendant before the court.[12]

Supplemented by case law, Rule 15–207(e)(4) and the Committee Note following the Rule lay out the kinds of things a

---

established non-compliance with the support order, the defendant has had the opportunity to show that he or she never had the ability to pay more than was paid but failed to do so, a finding of contempt is made, a purge is set, and the defendant establishes a current inability to meet that purge. Only at that point would the court be in a position to conclude that the defendant is "unable to comply with the order of the court." It is not necessary for the court to impose a sanction in a civil contempt case, even upon a finding of contempt, and, in this situation, no sanction involving the deprivation of liberty could be imposed in any event. Given that the State, rather than the obligee, would be the prosecuting party in the criminal contempt case and there would not have been any relevant fact (or legal conclusion) bearing on the contempt decided in favor of the defendant, it would not appear that either double jeopardy or collateral estoppel would bar a subsequent criminal contempt proceeding.

12. If a party or witness is duly summoned to appear in court and fails to do so, the court may issue a body attachment or, if necessary, a bench warrant, authorizing the person to be seized and brought before the court. *See Nnoli v. Nnoli,* 389 Md. 315, 323, n. 1, 884 A.2d 1215, 1219 (2005); *Wilson v. State,* 345 Md. 437, 450, 693 A.2d 344, 350–51

court *may* do. One possibility, as we have noted, is to terminate the civil contempt proceeding without a sanction and proceed with the filing of a criminal contempt case. Criminal contempt cases are harder to prove, however. They also depend on the willingness of the Attorney General or a prosecutor to file and proceed with one and, at the defendant's election, may require a jury trial. That option should therefore be reserved for the "diehard" case in which it is clear that no effective coercion is possible through civil contempt proceedings.[13]

If the court desires to proceed with the civil contempt but, due to the defendant's current inability to meet any meaningful purge, is precluded from imposing a sanction of incarceration, it should explore the reasons why the defendant is impecunious and attempt to deal with that situation. Usually, as here, the problem is lack of steady employment, which may, in turn, be occasioned by a variety of circumstances: mere

---

(1997). The sole purpose of such an order is to assure the presence of the person in court so that the hearing or trial may proceed. If a body attachment (or warrant) does not specify otherwise, "the person shall be brought without unnecessary delay before the judge who issued the attachment" and, "[i]f the court is not in session when the person is taken into custody, the person shall be brought before the court at its next session." Maryland Rule 1–361(c). *See also* Maryland Rule 2–510(i). Once the person is before the court and the immediate proceeding has been concluded, the attachment or warrant has achieved its mission and has no further efficacy. A court may *not*, as it did in these cases, use such an attachment or warrant as a pretext for continuing the incarceration of the defendant following that immediate proceeding. As neither Arrington nor McLong has specifically complained about any pre-hearing detention pursuant to the bench warrant, we do not address that issue as to them.

13. It is often supposed that incarceration under a determinate sentence does nothing to produce support payments. In many instances, that may turn out to be so, but it is not *necessarily* so. A defendant incarcerated in a local detention center under a criminal contempt sentence may be placed on work release or given employment in the prison setting. In that event, the law requires that part of his or her earnings be used to pay support obligations. *See* Maryland Code, §§ 11–602, 11–604, and 11–701 through 11–725 of the Correctional Services Article.

indolence or wilful defiance (voluntary impoverishment), physical, mental, or emotional disability, lack of general or specialized education, lack of a diploma, degree, certificate, or license of some kind that the defendant, with some reasonable effort and time, may be capable of obtaining, or a disabling addiction.

If unemployment is the problem, the court, upon determining the cause, may, under Rule 15–207(e)(4), enter reasonable and specific directives to deal with it. The court may order the defendant to pursue employment opportunities in a specific manner. It may order the defendant to pursue necessary education or a diploma, degree, certificate, or license that may be necessary or helpful in making the defendant eligible for meaningful employment. It may direct the defendant to seek a form of treatment for health or addiction problems that has a reasonable chance of dealing with the problem sufficiently to qualify the defendant for meaningful employment. In all instances, the directives must be specific and they must be reasonable. The programs must be available and affordable to the defendant, and they must be relevant to the objective. The court may order the defendant to report periodically, and it may monitor compliance. It may modify the requirements as circumstances warrant. If it appears that the defendant is wilfully not complying with the directives, the court may cause a criminal contempt proceeding to be filed, aimed at punishing defiance of the directives.[14] If, as a result of that defiance, the underlying support order remains in arrears, the State's Attorney, if so inclined, may pursue a criminal action under Family Law Article, § 10–203.

### *Arrington's Case*

■ The disposition in Arrington's case was patently unlawful. He was given a determinate sentence of eighteen months

---

**14.** Theoretically, it would be possible to coerce compliance with these kinds of directives through a civil contempt proceeding, but the court would likely run into the same problem of being unable to incarcerate the defendant unless it could find that the defendant had the current ability to meet any purge.

to the Division of Correction, which is a criminal sentence not permitted in a civil contempt case. That kind of disposition cannot be saved by adding a purge, especially when the purge is one that the court must have known Arrington could not immediately meet. The purge was that he enter Dismas House—a correctional facility—"and secure full-time employment with earnings withholdings . . ." As we indicated, not only was there no indication at the time that Arrington had been or would be accepted into Dismas House—the evidence showed only that he had been found an acceptable candidate for work release—but, even if he would be accepted into the Dismas House program, there was no indication that he could secure full-time employment in time to avoid the incarceration, which is what is required in a civil contempt case. The finding of contempt can stand, but the sanction imposed, even though no longer in effect, must be vacated.

### McLong's Case

The sanction in McLong's case is equally unlawful. He too was given a determinate sentence, of two years, which is itself unauthorized, with or without a purge. The initial purge of $2,000 was obviously one that McLong could not meet; nor was the amended purge of $200 and presentation of a GED certificate one that the court had any reason to believe could be instantly met. It appears that the amended order was entered without a hearing, and therefore without any evidence bearing on McLong's ability to meet that purge, and, indeed, without even giving McLong an opportunity to show that he could not meet the purge. As we indicated, one may not obtain a GED certificate unless and until the person passes a battery of tests, and there is nothing in the record to show that McLong, still incarcerated, had any ability even to take the tests. As with Arrington, the finding of contempt may stand, but the sanction must be vacated.

**IN NO. 10 (ARRINGTON), ORDERS OF OCTOBER 25 AND NOVEMBER 13, 2006 VACATED; COSTS TO BE PAID BY APPELLEE; IN NO. 26 (McLONG), ORDERS**

OF FEBRUARY 1, 2007, AND MAY 15, 2007 VACATED; COSTS TO BE PAID BY APPELLEE.

Chief Judge BELL joins the judgment only.